PRAIRIE WOOD PRODUCTS,
et al., Plaintiffs,

v.

Dan GLICKMAN, Secretary
of Agriculture, et al.,
Defendants,

and

Pacific Rivers Council, et al.,
Defendant–Intervenors.

BLUE MOUNTAIN NATIVE FOREST
ALLIANCE, et al., Plaintiffs,

v.

John LOWE, Regional Forester, United
States Forest Service, Region Six,
et al., Defendants.

Nos. 96–6058–HO, 95–1519–HO.

United States District Court,
D. Oregon.

April 10, 1997.

Scott W. Horngren, Shay S. Scott, Haglund & Kirtley, Portland, Or., for Prairie Woods Products, DR Johnson Lumber Co., Malheur Lumber Co., Malheur Timber Operators, Northwest Forest Resource Council, Dan Bishop, Thomas Lumber Co., Grant County, Valley County, Adams County, Idaho County, Boise County.

Kristine Olson, Thomas C. Lee., U.S. Attorneys Office, Portland, OR, Wells Burgess, U.S. Dept. of Justice, Washington, DC, James L. Sutherland, Asst. U.S. Atty., Eugene, OR, Lois J. Schiffer, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, John W. Watts, Dept. of Justice, General Litigation Section, Washington, DC, for Secretary, U.S. Dept. of Agriculture, being sued as Dan Glickman, U.S. Forest Service, being sued as Jack Ward Thomas.

James L. Sutherland, Asst. U.S. Atty., Eugene, OR, John W. Watts, Dept. of Justice, General Litigation Section, Washington, DC, for Robert W. Williams, David Jolly, Dale Worth.

Marianne G. Dugan, Western Environmental Law Center, Eugene, OR, Todd D. True, Adam J. Berger, Sierra Club Legal Defense Fund, Seattle, WA, for Pacific Rivers Council, Wilderness Soc., Inland Empire Public Lands Council, Idaho Conservation League.

## ORDER

HOGAN, Chief Judge.

These two consolidated cases involve challenges to the United States Forest Service's decision to implement certain resource conservation policies in nine national forests pending completion of long term forest plan strategy. The Prairie Wood Products plaintiffs (Prairie Wood plaintiffs) move for summary judgment under the National Forest Management Act (NFMA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA). Plaintiffs' Motion for Summary Judgment (# 40). The Blue Mountain Native Forest Alliance plaintiffs (Blue Mountain plaintiffs) move for partial summary judgment under NEPA. Plaintiffs' Motion for Partial Summary Judgment (# 29). Defendants have submitted cross motions for summary judgment. Federal Defendants' Motion for Summary Judgment (# 59) (Prairie Wood claims); Federal Defendants' Cross Motion for Partial Summary Judgment (# 31) (Blue Mountain claim). Defendant-intervenors move for summary judgment as to the Prairie Wood plaintiffs' fourth and seventh claims for relief. Defendants-intervenors' Cross Motion for Partial Summary Judgment (# 53).

### FACTS

The agency decisions at issue took place against a backdrop of information obtained by the United States Forest Service (Forest Service) in the early 1990s. *See* Defendants' Ex. L (# 134), Environmental Assessment (EA) at 1–3. That information, reflected in both private and government reports, indicated "broad declines in naturally reproducing Pacific salmon, steelhead, and sea-run cutthroat trout" and "widespread degradation of the habitat upon which these anadromous fish depend." *Id.* at 1. Other scientific studies identified risks to wildlife species in

old growth forests on the east side of the Cascade mountain range. *See* Eastside Screen Administrative Record (ES AR) at 1996; *see also* ES AR at 2135.

The Forest Service, with the cooperation of the Bureau of Land Management (BLM), began preparation of two Environmental Impact Statements (EISs) to consider the impacts of long term strategies dealing with the observed ecosystem degradation. In February, 1994, the Forest Service and BLM announced their intention to prepare an EIS for the Lower Columbia River Basin (Eastern Oregon and Washington), and in December, 1994, the agencies announced their intention to prepare an EIS for the Upper Columbia River Basin (Idaho and parts of Montana, Utah, Nevada, and Wyoming). *See* 59 Fed.Reg. 63071 (Dec. 7, 1994). The Forest Service initially expected to issue a draft of the Lower Columbia River Basin EIS in November, 1994, 59 Fed.Reg. 4680 (January 21, 1994), but now expects the draft EISs for both the lower and upper Columbia Basins to be issued in June of this year, with the final EISs expected one year later. *See* 62 Fed. Reg. 2176 (Jan. 15, 1997).

From late 1993 to 1995, the Forest Service developed several strategies pending completion of the Columbia River Basin EISs. The first, the Eastside Screens, was originally announced in a memorandum issued by the Regional Forester on August 18, 1993. Eastside Screens Administrative Record (ES AR) at 1090. In December, 1993, the Forest Service released a draft Environmental Assessment (EA) concerning a revised version of the screens. ES AR 1739. On May 20, 1994, the Forest Service issued a final EA, including a Finding of No Significant Impact (FONSI). ES AR at 2124, 2135. The Regional Forester amended the affected forest plans to incorporate the screens but did not amend the regional guide. ES AR at 2127.

The Eastside Screens initially consisted of three procedures for screening proposed timber sales. The riparian screen, however, which established no-harvest stream-side buffers, has been superseded by a more comprehensive riparian conservation strategy, as described below. *See* July 31, 1995 INFISH Decision Notice Correction, Defendants' Ex.

J at 4–1. Under the ecosystem screen, which remains effective, the Forest Service compares current conditions of a proposed timber sale area with the range of conditions that existed in that area prior to colonial settlement, called the Historic Range of Variability (HRV). 1994 Def. Ex. A, App. A at 3. Under the wildlife screen, the Forest Service imposes certain harvesting restrictions according to whether the condition of a sale area is within the HRV. *Id.* at 7–11. As originally drafted, the wildlife screen prohibited the sale of timber in late and old structural (LOS) stands.

The Forest Service amended the screens on June 5, 1995, to allow the Forest Service to permit certain types of "thinning, group or individual tree selection sales of the understory" in LOS stands meeting or exceeding the HRV. Decision Notice, Def. Ex. A at 5. The purpose of the amendment was to provide an opportunity "to reduce stress on the big trees by treating the understory, while also relieving some of the fuels accumulation." *Id.*

The second interim strategy, Interim Strategies for Managing Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California, has been dubbed "PACFISH". In March, 1994, the Forest Service and BLM issued a draft EA for PACFISH. After responding to public comments obtained during a 60–day comment period, the agencies issued a final Decision Notice, EA, and FONSI on February 24, 1995. PACFISH Decision Notice, Def. Ex. L. The affected forest plans and regional guides were amended to incorporate the PACFISH procedures. *See id.* at 8.

PACFISH is a strategy for the conservation of riparian environments. It restricts timber harvest and other management activities within Riparian Habitat Conservation Areas (RHCAs) as well as activities outside RHCAs that would degrade RHCAs. *Id.* at C–8 to C–19. PACFISH allows salvage and fuelwood logging within RHCAs only when the RHCA's woody debris needs are met, where such logging would not impair other riparian management objectives, and where adverse effects on anadromous fish listed

under the Endangered Species Act can be avoided. *Id.* at C–10.

The RHCAs consist of buffers which vary in width according to character of water (whether fish-bearing, perennial, etc. as described below) and topography. The first category is fish-bearing streams, for which the buffers include the stream and extend from each side of the stream to the top of the inner gorge, the outer edges of the 100–year floodplain, the outer edges of riparian vegetation, a distance equal to the height of two site-potential trees, or 300 feet slope distance (from each side of the stream) whichever is greatest. *Id.* at C–8. The three other categories are permanently flowing non-fish-bearing streams; ponds, lakes, reservoirs, and wetlands greater than one acre; and seasonally flowing or intermittent streams, wetlands less than one acre, landslides, and landslide-prone areas. These categories also have topographically-defined buffers but with 150 foot minimum widths for bodies of water in categories two and three. *Id.*

The third interim strategy, the Inland Native Fish Strategy (INFISH), involves non-anadromous fish bearing waters. As noted above, INFISH and PACFISH together superseded the riparian screens. INFISH is not challenged in either of these actions.

## DISCUSSION

### I. Standard of Review

■ The Forest Service's Environmental Assessments and forest plan amendments must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–74, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989) (arbitrary and capricious standard applies to agency findings which involve agency expertise). Although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The agency's action may not be set aside so

long as it has a "rational basis." *Bowman Transp., Inc. v. Arkansas–Best Freight System. Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The moving party must carry the initial burden of proof by identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party meets its burden, the burden shifts to the opposing party to present specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. Prairie Wood Plaintiffs' Claims

#### A. NFMA Significance

The Prairie Wood plaintiffs contend that incorporation of the Eastside Screens and PACFISH procedures constituted significant amendments to the forest plans, requiring the extensive public involvement and analysis, including an EIS, delineated in NFMA regulations. Defendants assert they properly applied internal Forest Service guidelines to find that the incorporation of the screens and PACFISH procedures would not significantly amend the affected forest plans.

NFMA allows forest plans to be amended "in any manner whatsoever after final adoption, ... and if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d)." 16 U.S.C. § 1604(f)(4). Subsections (d), (e), and (f) require a 10–step process including identification of purpose and need, collection of data, consideration of alternatives, and preparation of an EIS. *See* 16 U.S.C. § 1604(f); 36 C.F.R. §§ 219.10(f) and 219.12. For non-significant forest plan amendments, the agency must provide for

"appropriate public notification and satisfactory completion of NEPA procedures." 36 C.F.R. § 219.10(f).

NFMA does not define a "significant" forest plan amendment. Regulations promulgated under NFMA, however, make the Forest Supervisor responsible for determining, "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan, ... whether a proposed amendment would result in a significant change in the [forest] plan." 36 C.F.R. § 219.10(f).

The Forest Service Handbook (Handbook or FSH) provides guidelines for determining whether a forest plan amendment is significant. *See* FSH, Plfs' Ex. 1(# 43) at § 5.32. The Handbook states:

> The following factors are to be used when determining whether a proposed change to a forest plan is significant or not significant, based on NFMA planning requirements. Other factors may also be considered, depending on the circumstances.
>
> a. *Timing.* Identify when the change is to take place. Determine whether the change is necessary during or after the plan period (the first decade) or whether the change is to take place after the next scheduled revision of the forest plan. In most cases, the later the change, the less likely it is to be significant for the current forest plan.
>
> b. *Location and Size.* Determine the location and size of the area involved in the change. Define the relationship of the affected area to the overall planning area. In most cases, the smaller the area affected, the less likely the change is to be a significant change in the forest plan.
>
> c. *Goals, Objectives, and Outputs.* Determine whether the change alters long-term relationships between the levels of goods and services projected by the forest plan. Consider whether an increase in one type of output would trigger an

increase or decrease in another. Determine whether there is a demand for goods or services not discussed in the forest plan. In most cases, changes in outputs are not likely to be a significant change in the forest plan unless the change would forego the opportunity to achieve an output in later years.

> d. *Management Prescription.* Determine whether the change in a management prescription is only for a specific situation or whether it would apply to future decisions throughout the planning area. Determine whether or not the change alters the desired future condition of the land and resources or the anticipated goods and services to be produced.

FSH, pl's Ex. 1(# 43) at § 5.32(3).

### 1. The Screens

■ The Regional Forester considered the four Handbook factors before deciding that incorporation of the Eastside Screens into the affected forest plans would constitute non-significant amendments. On the timing factor, the Regional Forester noted his expectation that the interim screens would only be in effect 12 to 18 months. He also noted that timber sales proscribed by the interim screens may be allowed under the long-term strategy. Although plaintiffs correctly point out that more than 18 months have passed without issuance of either a draft or final Eastside Screen EIS, neither this delay nor other circumstances indicate that the Regional Forester's non-significance finding under NFMA was arbitrary, capricious or otherwise not in accordance with law.[1,2]

In assessing the "location and size" factor, the Regional Forester noted that the interim screens only apply to timber sales. The Regional Forester projected 50,000 acres of planned timber sales (over eighteen months) out of 11 million acres of national forest lands. The Regional Forester concluded

---

1. The Forest Service and BLM's September 11, 1996 "revised notice of intent to prepare environmental impact statements" indicates the delay may have been due to the complexity of the analysis as well as the 1996 government shutdown. 61 Fed.Reg. 47859 (Sept. 11, 1996).

2. This Court need not decide whether a decision, either explicit or *de facto,* not to replace a "temporary" policy may itself constitute a significant amendment under NFMA.

that "only small portions of each eastside forest will be affected."

Plaintiffs contend the nine national forests in their entirety constitute the "affected area." However, it was a reasonable construction of the NFMA regulations and Handbook criteria for the Regional Forester to consider timber sales as the "affected area" for purposes of applying the location and size criterion. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (deference due agency's reasonable construction of unclear statute that agency administers) and *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (deference due agency's construction of administrative regulations). The Regional Forester did not apply this factor in an arbitrary or capricious manner.

In assessing the goals, objectives, and outputs factor, the Regional Forester stated that the interim screens were designed to influence the location and size, rather than overall volume, of timber sales. ES Decision Notice, ES AR at 2133. Therefore, he reasoned that "it is not likely that any opportunity is being foregone to achieve projected outputs in later years of the planning period." *Id.* In addition, the Regional Forester noted that the interim screens furthered the Forest Service's obligations to meet other objectives besides timber harvest, such as wildlife and fish viability. *Id.* While plaintiffs argue that the screens have caused a decrease in the number of board feet harvested in the affected forests, they have not raised a material issue of fact as to whether the Regional Forester acted in an arbitrary or capricious manner by reasoning that timber output may be recouped later in the planning period and that other, non-resource extraction goals counseled in favor of a non-significant finding.

In assessing the management prescription factor, the Regional Forester stated that "the interim standards do not change the desired future condition for land and resources from that contemplated by the existing management direction in the forest plans in the

short-term." *Id.* at 2133. He noted that the interim screens only affect riparian areas, LOS stands, and areas containing old-growth associated species. *Id.* Finally, the Regional Forester noted that "the interim standards do not change forest plan allocations or management areas." *Id.* Although plaintiffs point out that evidence before the Regional Forester indicated that the interim screens may have been inconsistent with certain management directives contained in one or two of the affected forest plans, plaintiffs have not shown that the Regional Forester was arbitrary and capricious in reasoning that such a change would not affect the desired future conditions of the forests or that the change would occur in discrete areas of the affected forests for a limited period of time.

The Regional Forester's decision that incorporation of the Eastside Screens would not constitute a significant amendment to the affected forest plans was neither arbitrary, capricious, nor inconsistent with the law. NFMA defers the significance finding to the Forest Service, which has promulgated internal guidelines. Neither the statute, the regulations, nor the Handbook guidelines make any set of criteria binding on the Regional Forester. NFMA regulations allow the Forest Supervisor [3] to determine the significance of a forest plan amendment based on an "analysis of the objectives, guidelines, and other contents of the forest plan," 36 C.F.R. § 219.10(f), and the only court to address this provision held that it "expressly commends the significance of an amendment to the Forest Supervisor's judgment." *Sierra Club v. Cargill,* 11 F.3d 1545, 1548 (10th Cir.1993). The Forest Service interprets its Handbook factors as offering a "framework for consideration," rather than a binding set of criteria.

In this case, the Forest Service conducted an environmental assessment anticipating the effects of the interim screens, and the Regional Forester took a hard look at the four Handbook criteria before finding that the incorporation of the screens into the affected forest plans would not constitute a significant amendment. The evidence in the record in-

---

3. Plaintiffs' contention that the Forest Supervisor, rather than the Regional Forester, is re-

quired to make the significance determination is addressed below.

dicates that the Regional Forester's finding was in accordance with law and not arbitrary, capricious, or an abuse of discretion.

## 2. PACFISH

■ The Chief of the Forest Service, who signed the PACFISH Decision Notice, also considered the four Handbook factors in determining that incorporation of PACFISH into the affected forest plans would not constitute a significant amendment to the affected forest plans under NFMA. In considering the timing factor, the Forest Service Chief observed that the interim screens were expected to be in effect for only 18 months during the latter half of the planning periods for the affected forests. PACFISH Decision Notice, Defts' Ex. L (# 134) at 9. The PACFISH Decision Notice was issued February 24, 1995, and more than 18 months have expired without a longer term strategy replacing PACFISH. As with the interim screen decision, however, neither the delay in implementing a long term strategy nor other evidence in the record indicates that the Forest Service was arbitrary or capricious in finding that the timing factor supported a non-significance finding.

In considering the location and size factor, the Decision Notice observed that the PACFISH procedures only apply "to projects within Riparian Habitat Conservation Areas (RHCAs) or to projects outside RHCAs that would degrade RHCA condition." *Id.* As indicated above, it is a reasonable construction of NFMA, NFMA guidelines, and Handbook criteria to interpret the "affected area" as the portions of the affected forests in which the PACFISH standards will be applied, rather than the entire forest whose plans are subject to amendment. The Forest Service acted in accordance with these guidelines and was neither arbitrary nor capricious in concluding that "the areas in the planning unit affected by the interim standards and guidelines is not so large in size as to mandate a significant amendment." *Id.*

In assessing the goals, objectives, and outputs factor, the Decision Notice first notes that NFMA requires the relevant agency to pay heed to various objectives and does not guarantee particular output projections. *Id.*

The Decision Notice states that "the effects on timber supply and other commodity resources are short-term" and the interim strategy "will not significantly alter the long-term relationships between the levels of goods and services projected by the forest plans." *Id.* The Decision Notice further provides that "[a]ny short term temporary reductions in outputs do not foreclose opportunities to achieve such outputs in later years." *Id.* at 10.

While plaintiffs point to evidence in the record which predicted a 58 million board foot reduction in timber yield in the affected forests due to PACFISH, this evidence is not sufficient to render the Forest Service's decision arbitrary and capricious. As noted, the Forest Service was obligated to consider its duty to meet other goals and objectives and to consider the possibility that canceled timber sales may be recouped in the future. The Forest Service was not arbitrary or capricious in finding that the goals, objectives, and outputs criterion did not warrant a finding of significance under NFMA.

In considering the management prescriptions factor, the Forest Service reiterated that PACFISH was expected to be temporary and applicable only within RHCAs. Moreover, the Decision Notice reasoned that PACFISH would "work to accomplish an element of the multiple use desired future condition of the Regional Guides and forest plans by providing for protection of threatened, endangered and sensitive species" and the "desired future conditions and long-term levels of goods and services projected in current plans would not be substantially changed by the interim strategy." *Id.* The Forest Service did not act in an arbitrary or capricious manner in applying the management prescription factor.

The Forest Service took the requisite "hard look" at the issue of whether incorporation of the PACFISH standards into affected forest plans would constitute significant amendments under NFMA. As discussed above, Congress has allowed the Forest Service substantial leeway in determining the significance of proposed forest plan amendments. The Forest Service Chief's finding that the PACFISH amend-

ments would not be significant was in accordance with the law and was neither arbitrary, capricious, nor an abuse of discretion.

## B. Failure to Follow Forest Service Procedures

Plaintiffs claim both the interim Eastside Screens and PACFISH were incorporated into the forest plans in violation of NFMA's forest plan amendment procedures. Plaintiffs contend that NFMA regulations required the forest plans to be amended by the Forest Supervisors on a "forest-by-forest basis," rather than by the Regional Forester on a regional basis. Plaintiffs also contend the Forest Service was required to employ a "forest level interdisciplinary team" during the amendment process. Finally, plaintiffs claim the Forest Service failed to follow the procedures for amending the Regional Guide.

36 C.F.R. § 219.10 provides the general procedure for forest planning, and section 219.10(a) describes the responsibilities of the Regional Foresters, Forest Supervisors, and interdisciplinary teams. That section provides:

> (1) Regional Forester. The Regional Forester shall establish regional policy for forest planning and approve all forest plans in the region.
>
> (2) Forest Supervisor. The Forest Supervisor has overall responsibility for the preparation and implementation of the forest plan and preparation of the environmental impact statement for the forest plan. The Forest Supervisor appoints and supervises the interdisciplinary team.
>
> (3) Interdisciplinary Team. The team, under the direction of the Forest Supervisor, implements the public participation and coordination activities required by § 219.6 [public participation requirements] and § 219.7 [governmental coordination requirements].

36 C.F.R. § 219.10(a).

■ While 36 C.F.R. § 219.10(a)(2) gives the Forest Supervisor the authority to amend the forest plan, it does not describe this authority as exclusive nor does it expressly prohibit the Regional Forester from issuing a decision notice regarding amendment of forest plans. Defendants contend the Regional Forester's broader responsibilities permit him to approve forest plan amendments where "coordination of the standards and guidelines between forests is necessary." Federal Defendants' Memorandum in Support of Motion for Summary Judgment (# 60) at 33. This is a reasonable interpretation of NFMA management guidelines. The Regional Forester acted in accordance with the law and was neither arbitrary nor capricious in issuing the decision notice regarding amendment of affected forest plans to incorporate the interim screens and PACFISH, and the Forest Service was not required to employ the Forest Supervisors and interdisciplinary teams in this regard.

■ With regard to the amendment of the regional guide, plaintiffs argue that defendants failed to prepare draft and final EISs, failed to provide the requisite comment period, and failed to obtain the Forest Service Chief's approval. The regional guide, however, was not amended to incorporate the Eastside Screens, and 36 C.F.R. § 219.8 does not require such an amendment (Regional Forester "may" amend regional guide). The PACFISH Decision Notice, as noted above, properly concluded that adoption of PACFISH would not significantly amend either the forest plans or the regional guide. As discussed above, the procedures demanded by plaintiffs, including an EIS and 90–day comment period, are only required for significant amendments. See 36 C.F.R. § 219.10(f). Finally, plaintiffs' argument that the Chief of the Forest Service failed to approve the PACFISH amendment is not well taken, given that the Chief of the Forest Service signed the PACFISH Decision Notice. See PACFISH Decision Notice, Def. Ex. L (# 134) at 13.

## C. Failure of Screens to Protect Against Fire, Insects, and Disease

Plaintiffs contend the interim screens violate the Forest Service Organic Act of 1897 as well as NFMA by failing to protect forests against fire, insects, and disease. 16 U.S.C. § 551 requires the Secretary of Agriculture to "make provisions for the protection

against destruction by fire and depredations upon the public forests and national forests...." NFMA permits timber sales on otherwise protected lands where necessary to prevent or reduce losses from fire, insects, and disease. 16 U.S.C. § 1604(k). NFMA regulations require forest management prescriptions to:

> Consistent with the relative resource values involved, prevent or reduce serious, long lasting hazard and damage from pest organisms, utilizing principles of integrated pest management. Under this approach all aspects of a pest-host system should be weighed to determine situation-specific prescriptions which may utilize a combination of techniques including, as appropriate, natural controls, harvesting, use of resistant species, maintenance of diversity, removal of damaged trees, and judicious use of pesticides. The basic principle in the choice of strategy is that, in the long term, it be ecologically acceptable and compatible with the forest ecosystem and the multiple use objectives of the plan.

36 C.F.R. § 219.27(a)(3).

■ The June 5, 1995 amendments to the interim screens address the threats of fire, insects, and disease in the affected forests. The Decision Notice for the June 5, 1995 amendment "allow[s] some timber harvest, limited to thinnings, group or individual tree selection" in order to respond to "the continuing threats to forest health by insects, disease and fuel accumulation...." June 5, 1995 amendment Decision Notice, Def. Ex. A (# 134) at 4. This amendment was sufficient to meet the Forest Service's duty to safeguard the forests from insect, fire, and disease in the context of its multiple use obligations and objectives.

## D. NEPA Significance

Plaintiffs claim defendants were arbitrary and capricious in finding that neither the screens nor PACFISH would have a significant effect on the quality of the human environment under NEPA. Accordingly, plaintiffs argue that defendants erred by failing to prepare EISs prior to implementing the screens and PACFISH.

■ NEPA requires "to the fullest extent possible," that federal agencies prepare an EIS when taking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The agency need not prepare an EIS when doing so would conflict with the agency's obligations under other environmental statutes. *Douglas County v. Babbitt*, 48 F.3d 1495, 1502 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996); *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976). Preparation of an EIS is also unnecessary when the agency's action merely prevents human interference with the physical environment rather than irretrievably committing resources. *Douglas County*, 48 F.3d at 1505; *Conner v. Burford*, 836 F.2d 1521, 1529 (9th Cir.1988).

Defendants suggest, without relying on, the argument that EISs are not required because the interim screens and PACFISH protect the environment rather than irretrievably commit resources. Nonetheless, it is apparent from the record that both the screens and PACFISH are designed to arrest environmental degradation in order to preserve the environmental status quo. *See* PACFISH Decision Notice, Deft. Ex. L at 1 ("interim strategy designed to halt the degradation and begin the restoration of anadromous fish habitat") and Eastside Screen EA, ES AR (# 27) at 2135 (interim standards designed to provide "best approach for maintaining future planning options concerning wildlife habitat associated with [LOS] stages, anadromous fish habitat, and old forest abundance"). Moreover, both strategies provide additional guidelines and restrictions on the commission of resources, rather than irretrievably committing resources. The PACFISH FONSI states that PACFISH will "reduce the potential environmental impacts of project decisions." Def. Ex. L (# 134) at 2. The Eastside Screen FONSI similarly finds that the interim screens are designed to "reduce the effects on the physical and biological environment" and will "not produce any significant, irreversible, irretrievable effects." ES FONSI (# 27) at 2131. *See also* PACFISH EA, Def. Ex. L at 37. The screen decision also assumes that the screens will

not "result in ground-disturbing activities or direct changes to the environmental status quo". *Id.* Finally, both strategies require NEPA, ESA, and NMFS documentation, if appropriate, on a site-specific basis when and if resources are committed. *See e.g.,* ES AR (# 27) at 2124; PACFISH FONSI, Deft. Ex. L (# 134) at 2.

■ This situation is similar to the "No Surface Occupancy" leases in *Conner,* where the agency's action involved the prospect of future oil extraction but did not allow surface occupancy and, thus, did not irretrievably commit the resource. *Conner v. Burford,* 836 F.2d at 1529. It is the opinion of this court that neither PACFISH nor the screens required preparation of an EIS, because both strategies were designed and anticipated to conserve the physical environment rather than irretrievably commit resources. The court will, however, address the propriety of the Forest Service's FONSIs as an alternative to the above holding.

■ If an agency finds, based on an EA, that a proposed action will not significantly affect the environment, that agency may issue a Finding of No Significant Impact (FONSI) in lieu of an EIS. 40 C.F.R. § 1508.13. The regulations, promulgated pursuant to NEPA by the Council on Environmental Quality (CEQ), require the agency to consider both the "context" and "intensity" of the proposed action, *id.* at § 1508.27, and the regulations list ten factors which the agency "should" consider in judging whether the intensity of the proposed action warrants a finding of significance. *See id.* at § 1508.27(b)(1), (10). The agency's determination as to the significance of the proposed action must be upheld as long as the agency took a "hard look" at the environmental consequences of its decision. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

Plaintiffs challenge the Forest Service's FONSI in myriad fashion. Their first argument appears to be that the Forest Service intended to implement the screens and PACFISH over the long term but analyzed the environmental effects of the strategies over the short term. Plaintiffs' Memorandum in Support of Motion for Summary Judgment (# 41) at 30. Plaintiffs point to 42 C.F.R. § 1508.27(a), which provides that "[b]oth short- and long-term effects are relevant," and to 36 C.F.R. § 1508.27(b)(7), which states that significance "cannot be avoided by terming an action temporary . . . ."

■ There is no indication in the record that the Forest Service intended to initiate long term strategies but abused its discretion by labeling the strategies temporary for the purpose of assessing their environmental effects. The Ninth Circuit has indicated that an agency may consider the temporary nature of its action. *Am. Horse Protection Ass'n v. Andrus,* 608 F.2d 811, 814–15 (9th Cir.1979) (quoting *Am. Horse Protection Ass'n v. Frizzell,* 403 F.Supp. 1206, 1219 n. 9 (D.Nev.1975)). Indeed, the CEQ regulations expressly permit the Forest Service to consider both long and short term effects. 42 C.F.R. § 1508.27(a). While the regulations require the Forest Service to consider the cumulative effect of "related ... actions," the Forest Service is not required to consider the impacts of an anticipated long-term strategy for which the planning process has not yet commenced. *Compare Daly v. Volpe,* 514 F.2d 1106, 1110 (9th Cir.1975) (two joined highway projects had "independent utility" such that their impacts could be considered in separate EISs) *and Sylvester v. United States Army Corps of Eng'rs,* 884 F.2d 394, 400 (9th Cir.1989) (Squaw Valley golf course and Squaw Valley resort need not be considered in same EIS) *with Thomas v. Peterson,* 753 F.2d 754 (9th Cir.1985) (logging road construction and sale of accessed timber were interdependent such that their impacts must be considered in same EIS); *see also* 40 C.F.R. § 1508.7 (defining "cumulative impact" to include "reasonably foreseeable future actions"). There is no evidence in the record that the Forest Service abused its discretion or acted in an arbitrary or capricious manner by taking into account the fact that the interim screens and PACFISH were slated for replacement by the long-term Interior Columbia River Basin strategies or by failing to consider the impacts of such long-

term strategies.[4]

■ Plaintiffs challenge the Forest Service's assessment regarding whether the screens or PACFISH "may establish a precedent for future actions with significant effects or represent[ ] a decision in principle about a future consideration." 40 C.F.R. § 1508.27(b)(6). The Regional Forester considered this factor in the Eastside Screen Decision Notice, concluding that the screens would not set a precedent for future actions likely to result in significant environmental consequences, nor represent a decision in principle about future considerations. ES AR (# 27) at 2131. The Regional Forester reasoned that the forthcoming Eastside Screen EIS would involve a superseding strategy. *Id.* at 2132. As indicated above, there is no evidence in the record that was considered by the Regional Forester that the long-term strategy would evolve from the interim screens as a matter of course. To the contrary, the long-term strategy, if challenged, will have to survive on its own procedural merits. The Regional Forester acted reasonably in concluding that any long-term strategy would be founded on the appropriate NEPA documentation and analysis, and not on the interim screens.

The Forest Service also considered the propensity for precedential value with respect to PACFISH. PACFISH FONSI, Def. Ex. L (# 134) at 3–4. The PACFISH FONSI reasoned that the interim policy would be superseded by the long-term policy, which would entail an EIS. The PACFISH FONSI also observed that the interim strategy would have no binding effect on any long-term strategy decision. *Id.* at 4. Plaintiffs' allegation that "[t]he agencies clearly are assuming that eventual amendment of plans will occur to comport with the interim standards, and an EIS will approve them," Plaintiffs' Memorandum in support of Motion for Summary Judgment (# 41), is not supported by the record. As discussed above, the validity of any long-term strategy will depend on that strategy's procedural record. Under these circumstances, defendants gave adequate consideration to the propensity for the interim strategies to serve as precedent for future actions having significant effects or to serve as a decision in principle about a future consideration, as provided in 40 C.F.R. § 1508.27(b)(6).

Plaintiffs allege the Forest Service erred by failing to assess environmental impacts which the Forest Service deemed beneficial. 40 C.F.R. § 1508.27(b)(1) provides that the agency should consider that a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." Again assuming the Forest Service was required to assess the effects of actions not involving an irretrievable commitment of forest resources, the record evidences the Forest Service's efforts to analyze the likely effects of both the screens and PACFISH, even where the Forest Service may have considered such effects to be beneficial. *See generally,* ES EA (# 27), PACFISH EA, Def. Ex. L (# 134).

■ Plaintiffs also challenge the Forest Service's FONSIs on the basis that the interim strategies are likely to have "effects on the human environment that are highly uncertain...." 40 C.F.R. § 1508.27(b)(5). In the Eastside Screen FONSI, the Regional Forester concluded that the interim screens would pose no "highly uncertain, unique, or unknown environmental risks." ES FONSI, (# 27) at 2130. The Regional Forester reasoned that the screens were based on "professional scientific interpretation of research and forest conditions, and fish and wildlife habitat needs." *Id.* In addition, the Regional Forester observed that any effects on riparian and fish habitat would be "by improvement or maintenance of current conditions." *Id.* at 2130–31.

The Forest Service also considered the potential for uncertain or unknown risks in the PACFISH FONSI. That FONSI observed that PACFISH was based on "the best available scientific information" and that similar measures had been in effect in areas subject to Spotted Owl protections. PACF-

4. This Court need not decide whether a decision, either explicit or *de facto,* not to replace a "temporary" policy may itself have a significant effect on the human environment under NEPA. *See* note 2.

ISH FONSI, Def. Ex. L (# 134) at 3. The FONSI concluded that PACFISH "would not impose any highly uncertain, unique, or unknown environmental risks." *Id.* The PACFISH FONSI, as well as the screen FONSI, took the requisite hard look at the possibility of uncertain effects.

■ Plaintiffs contend the Forest Service gave inadequate consideration to the possibility that the interim screens and PACFISH would "have effects on the quality of the human environment [that] are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Again, both the Eastside Screen FONSI and the PACFISH FONSI addressed this concern. In the Eastside Screen FONSI, the Regional Forester reasoned that there had not been a "substantial dispute as to the size, nature, or effect of the federal actions" and that the "scientific basis for this interim direction has been evaluated by Forest Service biologist [sic] and scientists." ES AR (# 27) at 2131. While there may have been a difference of scientific opinion regarding the wisdom of the screen policy, the record does not indicate that the Regional Forester was arbitrary or capricious in concluding that there was insufficient scientific controversy regarding the effects of that policy to warrant a finding of significance.

With regard to the PACFISH FONSI, the Forest Service noted that PACFISH had been opposed by certain groups which stood to "experience adverse economic effects" and that other groups had advocated more restrictive measures. PACFISH FONSI, Def. Ex. L (# 134) at 3. The PACFISH EA cited several studies regarding 100 foot riparian buffers but concluded that "[a]lthough RHCAs narrower than certain widths might be adequate to protect certain individual stream functions," buffers of 200 to 300 feet on each side of the stream would better protect against non-channelized sediments. PACFISH AR (# 31) at F–18. Moreover, the studies cited by plaintiffs do not specifically state that 100 foot buffers are appropriate to protect against non-channelized sediment, *see id.* at C–7 and F–18; therefore, these studies do not directly contradict the Forest Service's decision that 300 foot buff-

ers are appropriate. The FONSI's conclusion that PACFISH "would not involve social or economic effects that are likely to be highly controversial," PACFISH FONSI, Defts' Ex. L (# 134) at 3, was not arbitrary or capricious.

The Forest Service rationally considered relevant factors in determining that adoption of the Eastside Screens and PACFISH interim strategies would not have a significant effect on the human environment. The Forest Service took the requisite "hard look" at the environmental effects of its decisions and at the factors specified in 40 C.F.R. § 1508.27. Defendants acted in accordance with law, were not arbitrary or capricious, and did not abuse their discretion in issuing FONSIs for both the Eastside Screens and PACFISH.

**E. Predetermination of Screen Decision**

Plaintiffs claim that defendants violated NEPA by deciding to adopt the interim Eastside Screens prior to completing the required NEPA analysis. Plaintiffs point specifically to a letter written by the Regional Forester to the Fish and Wildlife Service prior to issuing the final Eastside Screen EA. That letter stated in part:

> I have decided that it would be appropriate to incorporate the screening criteria into the Forest plans to guide the planning and design for new timber sales. . . . An [EA] is currently being developed to adopt the screening criteria, on an interim basis, through non-significant forest plan amendments.

ES AR (# 26) at 1729.

> The regulations provide:
>
> § 1500.1 Purpose.
>
> (b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to

the action in question rather than amassing needless detail.

40 C.F.R. § 1500.1(b).

█ This provision does not prohibit agency officials from offering their opinions as to the strategy which they believe the appropriate analysis will bear out as the best alternative. Rather, it indicates that the general purpose of NEPA is to ensure that information is available before a decision is made or an action taken. Like the long-term strategies, the interim screens policy rests on the merits of its supporting documentation. The Regional Forester's statement that he believed it would be appropriate to commence an EA addressing the screens is not a basis for voiding the screen policy once implemented in compliance with applicable environmental procedures.

### F. Inadequate Consideration of Alternatives

Plaintiffs claim defendants failed to consider an adequate range of alternatives to both the Eastside Screens and PACFISH strategies. Plaintiffs suggest the Forest Service erred by refusing to consider setting riparian standards in accordance with the forest practice rules of Oregon, Washington, and California as an alternative to PACFISH. Plaintiffs' Memorandum in Support of Motion for Summary Judgment (# 41) at 36. Plaintiffs also appear to suggest that the range of screen alternatives was patently inadequate. *Id.* at 35.

█ NEPA requires federal agencies to "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4322(2)(E). The CEQ regulations provide that an EA "[s]hall include brief discussions of alternatives...." In the Ninth Circuit, an agency's range of alternatives is reviewed under a "rule of reason" which "requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180 (9th Cir.1990) (internal citations and quotation omitted). NEPA does not require

consideration of alternatives whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative.... Nor must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area.

*Id; see also Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp.,* 42 F.3d 517, 524 (9th Cir. 1994).

Other circuits have held that the agency may consider fewer alternatives in an EA, i.e., when the agency has found that a decision will not have a significant effect on the environment. *See e.g., Missouri Mining, Inc. v. Interstate Commerce Comm'n,* 33 F.3d 980, 984 (8th Cir.1994); *Friends of the Ompompanoosuc v. Fed. Energy Regulatory Comm'n,* 968 F.2d 1549, 1558 (2d Cir.1992); and *N.C. v. F.A.A.,* 957 F.2d 1125, 1134 (4th Cir.1992). Nevertheless, the EA should

set out relevant information to help the decision maker choose a policy option (and to help others evaluate that choice), and not simply provide a justification as to why a choice is permissible.... Thus an EA is more than simply the agency's post hoc rationalizations of its decision.

*Sierra Club v. Watkins,* 808 F.Supp. 852, 870 (D.D.C.1991); *see also, Ayers v. Espy,* 873 F.Supp. 455, 467–68 (D.Colo.1994).

#### 1. PACFISH

In deriving a range of alternatives to PACFISH, the Forest Service began by defining the interim project purpose according to three factors: geographic coverage, management direction, and types of activities covered. PACFISH EA, Def. Ex. L (# 134) at 24. The Forest Service then eliminated without detailed study one alternative as outside the agency's jurisdiction, three alternatives as outside the project's geographic purposes, and six alternatives as outside the project's management directions. *Id.* at 25–27.

The Forest Service then considered five alternatives in detail. Alternative one would have allowed management to proceed under current forest plans. Alternative two would have followed a scientific panel report in

setting standards and guidelines on road construction, logging, slash treatment and fire, range and restoration as well as setting riparian buffers. Alternative three would have established standards and guidelines for all management activities as well as riparian buffers. Alternative four (the alternative ultimately chosen) would establish standards and guidelines for all management activities as well as riparian buffers and would involve watershed analyses and key watershed designation. Alternative five would have required the same standards and guidelines as alternatives three and four plus complete analyses of key watersheds prior to initiation of new projects. *See id.* Table 1. The Forest Service assessed the impact of each alternative on watershed and water resources, *id.* at 40–46; non-forested vegetation, *id.* at 46–50; forested vegetation, *id.* at 50–52; fishery resources, *id.* at 52–55; threatened, endangered, and sensitive species, *id.* at 56–58; and social effects, *id.* at 59–60. The Decision Notice selected alternative four, the PACFISH policy, as the best alternative.

While the Forest Service did not consider the alternative of setting forest riparian standards to correspond to those of Washington or Oregon, the Forest Service did respond to the suggestion, made during the comment period, of adopting Idaho's forest practice standards. The Forest Service opined, however, that the Idaho standards "may not provide a level of fish habitat protection sufficient to meet the legal and regulatory obligations of the Agencies" and that the 5–foot buffers provided in the Idaho plan would not "serve the purpose and need of the interim direction." *Id.* at App. F–19. The Oregon, Washington, and California forest practice rules provide buffers ranging from three times the stream width or 50 feet to 300 feet, while the former national forest plans, which were considered as alternative one, provided for 100 foot buffers.

■ It does not appear that the suggestion to follow Oregon, Washington, and California's forest practice rules was made prior to the Forest Service's February 24, 1995 completion of the PACFISH EA. *See* Appeal Comments to Forest Service and BLM, Ex. A to letter from Scott Horngren to Dan

Glickman, PACFISH AR, vol. XV at 21 (dated April 14, 1995). Even assuming the strategy of following Oregon, Washington, or California's riparian management practices had been presented to the Forest Service before the Forest Service issued the final PACFISH EA, the Forest Service would not have been arbitrary and capricious in failing to afford detailed consideration to such an alternative. The alternatives considered provided the decision maker with a buffer range of 100 to 300 feet, and the Idaho rules presented the option of five foot buffers. Given its objectives, the Forest Service considered a range of riparian management strategies that was sufficient to reach an informed decision.

### 2. Screens

To the extent the Prairie Wood plaintiffs' objections to the Eastside Screen are based on defendants' failure to consider alternatives to the riparian screen, those objections are resolved by the above analysis since the riparian screens were superseded by PACFISH. Prairie Wood plaintiffs' claim regarding the range of alternatives to the wildlife and ecosystem screens is addressed below in the context of the Blue Mountain plaintiffs' claim.

### G. Administrative Procedure Act (APA)

■ Prairie Wood plaintiffs claim the Forest Service's decision to incorporate significant new information into its forest plan and regional guides without following the significant amendment procedures of NFMA and NEPA was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). The APA, however, is merely a vehicle for carrying substantive challenges to court and does not provide a cause of action independent from the substantive laws governing agency action. *See City of Santa Clara, Calif. v. Andrus*, 572 F.2d 660, 666 (9th Cir.1978). Accordingly, any claim based on the APA is rendered moot by the resolution of plaintiffs' substantive claims.

### III. Blue Mountain Plaintiffs' Claim

Blue Mountain plaintiffs' sole claim for summary judgment is that the Forest Service erred by failing to consider a reasonable range of alternatives to the Eastside Screens. In particular, the Blue Mountain plaintiffs contend the Regional Forester should have considered a moratorium on logging in LOS stands and certain roadless areas. Such a moratorium was recommended to the Regional Forester by plaintiff Natural Resources Defense Council (NRDC) via scoping comments prior to issuance of the draft EA. *See* Blue Mountain Plaintiffs' Ex. 13 at 2–4, Ex. 14 at 3–4, and Ex. 15 at 3,5.

■ As indicated above, an agency is required to consider a range of alternatives sufficient to permit a reasoned choice but is not required to consider alternatives that are inconsistent with management objectives for the affected area. *See Headwaters, Inc. v. Bureau of Land Management,* 914 F.2d 1174, 1180 (9th Cir.1990). In the Eastside Screen EA, the Regional Forester described the project purpose as follows:

> Region 6 of the Forest Service has a short-term need to maintain future management options for consideration in the Eastside EIS. In particular, there is a need to maintain the abundance and distribution of old forest structure and to protect riparian areas for wildlife and fish species that are showing population declines as these habitat components are reduced. At the same time, there is an economic need to continue some timber production. The Forest Service proposes to meet this need through the continued use of interim management direction designed to offer further protection to riparian, ecosystem, and wildlife values.

Eastside Screen EA, Blue Mountain Plaintiffs' Ex. 17(# 46) at 3 (internal footnote omitted).

The Regional Forester considered in detail three alternatives in the Eastside Screen EA. The first alternative was to continue managing the forests under pre-screen standards. The second was to impose a complete logging moratorium on the affected forests. Alternative one was rejected as not providing sufficient environmental protection. ES Decision Notice, Blue Mountain Plaintiffs' Ex. 18(# 46) at 5. Alternative two was rejected as likely to cause severe economic impacts. *Id.* at 6. The third alternative was the ultimately chosen screen policy. See *id.* at 14.

The Regional Forester rejected the alternative of implementing species-specific guidelines, deeming such an approach too time-consuming given the need for an immediate short-term policy. *See id.* at 14. The Regional Forester did not consider a moratorium in LOS stands and roadless areas nor any other partial moratorium.

■ As indicated above, the Regional Forester had the discretion to select a range of alternatives sufficient to allow a reasoned choice as to the best way to manage the eastside forests in light of recent environmental degradation, and that discretion was broadened by the fact that the proposed action was deemed not likely to have a significant effect on the environment. Although the Blue Mountain plaintiffs are correct in pointing out that the first two alternatives were unlikely to accomplish the project purpose, those alternatives did provide a framework for considering a range of economic and environmental impacts. Under the circumstances of this case, where a course of action is deemed unlikely to significantly affect the environment and does not constitute an irretrievable resource commitment, the alternatives considered were "appropriate" under NEPA, 42 U.S.C. § 4322(2)(E). Accordingly, the Regional Forester's analysis of alternatives to the Eastside Screens was in accordance with law and was not arbitrary, capricious, or an abuse of discretion.

### CONCLUSION

Prairie Wood plaintiffs' Motion for Summary Judgment (# 40) is denied. Defendants' Motion for Summary Judgment (# 59) and Cross–Motion for Partial Summary Judgment (# 31) are allowed. Blue Mountain plaintiffs' Motion for Partial Summary Judgment (# 29) is denied. Defendant–Intervenors' Motion for Partial Summary Judgment (# 53) is denied as moot. The clerk is directed to enter an order dismissing Prairie

Wood plaintiffs' Complaint (# 1) with prejudice.