TROUT UNLIMITED, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Defendants,

v.

The Water Supply and Storage Company, a Colorado nonprofit corporation, the City of Greeley, a Colorado municipal corporation, the Greeley Water and Sewer Board, the State Engineer of the State of Colorado, and the Colorado Water Conservation Board, Defendant–Intervenors.

No. CIV.A. 96–WY–2686–WD.

United States District Court, D. Colorado.

April 30, 2004.

J. Gregory Whitehair, Gibson, Dunn & Crutcher, Denver, CO, Michael Kemp Murphy, Gibson, Dunn & Crutcher, Washington, DC, for Plaintiffs.

Wendy Carol Weiss, Attorney General's Office, Denver, CO, David William Gehlert, U.S. Department of Justice Environment & Natural Resources Division, Denver, CO, William Ross Fischer, Fischer, Brown & Gunn, PC, Fort Collins, CO, for Defendants.

James Stow Witwer, Adam T. Reeves, Trout & Raley, PC, Carol D. Angel, Attorney General's Office, Denver, CO, for Defendant–Intervenors.

## ORDER ON COMPLAINT FOR DECLARATORY AND IN-JUNCTIVE RELIEF

DOWNES, District Judge.

This matter comes before the Court on Plaintiffs' Complaint for Declaratory and Injunctive Relief, Plaintiffs' Motion for Summary Judgment and Defendants' and Defendant–Intervenors' Affirmative Defenses. The Court, having considered the briefs and materials submitted in support of the parties' various positions and the opposing parties' respective oppositions thereto, having heard oral argument of counsel, and being otherwise fully advised, FINDS and ORDERS as follows:

### BACKGROUND

Plaintiffs challenge the Forest Service's approval of a land use authorization (easement) for Long Draw Reservoir on La Poudre Pass Creek in the mountains west of Fort Collins, Colorado. Long Draw is one of numerous high mountain water storage facilities on tributaries of the headwaters of the Cache la Poudre River. Construction of the Long Draw Dam was completed in 1929. The expansion of the reservoir almost thirty years later caused water to back up onto 390 acres of additional National Forest land and required Water Supply and Storage Co. (WSSC) to obtain authorization for the use of that land, which it did in 1973. That permit expired in 1976 and the Forest Service issued a series of short term renewals until 1980. In 1980 the agency issued a new permit, which was amended in 1981 to extend its life until December 31, 1991. The 1981 amendment acknowledged that future permits would be subject to conditions imposed by the Forest Service. In 1991 the special use permit was extended until July 31, 1994, to allow for analysis of the environmental impacts of issuing a renewal of the land use authorization. It is this environmental analysis and the renewal of the authorization that is the subject of this litigation.

In 1986, Congress designated the segment of the Cache la Poudre River from Poudre Lake to the confluence of the river and Joe Wright Creek as a wild river pursuant to the Wild and Scenic Rivers Act. Several fish species are native to the Cache la Poudre River and its tributaries. The water supply from the La Poudre Pass Creek is vital to several threatened and endangered species and is a habitat for the greenback cutthroat trout. WSSC stores water in the Long Draw Reservoir to be released for downstream municipal and agricultural use by its shareholders. Under the original permit, the gates of the Long Draw Reservoir were typically closed from November through March or April each year. During this period, all native flows of the La Poudre Pass Creek are captured in the reservoir, and no water is released to the Creek downstream of the reservoir. As a result, La Poudre Pass Creek is effectively dried up during the winter months.

After issuance of the original permit, final regulations implementing the Federal Land Policy and Management Act (FLPMA) were promulgated. These regulations, administered by the Forest Service, include the requirement that "each special use authorization must contain: (I) terms and conditions which will: (A) Carry

out the purposes of applicable statutes and rules and regulations issued thereunder; [and] (B) Minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment ...." 36 C.F.R. § 251.56(a). Consistent with this regulatory requirement, the Forest Plan for the Arapaho and Roosevelt National Forests provides that "[h]abitat for each [existing vertebrate] species on the forest will be maintained at least at 40 percent or more of potential," and requires the Forest Service to "manage waters capable of supporting self-sustaining trout populations to provide for those populations." (AR–LD at 4587.) The Forest Plan also states one of its goals is to "recognize the value of water for the future of western states." *Id.*

During the early 1990s, various applicants for and holders of expiring special use authorizations for water development projects on Forest Service lands complained to Congress that their activities should not be subject to the environmental protections of FLPMA, including any requirements for bypass flows. Some members of Congress then approached then-Secretary of Agriculture Edward Madigan with objections to the Forest Service's authority to require minimum bypass flows in authorizations for use of lands in the Arapahoe and Roosevelt National Forests. Secretary Madigan responded by letter, assuring those members of Congress that "[t]he Forest Service will reissue permits for existing water supply facilities for 20 years" and that "[n]ew bypass flow requirements will not be imposed on existing water supply facilities" (Madigan Policy).

In September of 1993, the cities of Fort Collins and Greeley, Colorado, and WSSC, submitted a "Proposed Joint Operations for Mainstem Poudre River Flow Enhancement" (JOP) to the Forest Service, providing for additional flows for the Poudre between December and March. In November of 1993, pursuant to the National Environmental Protection Act (NEPA), the Forest Service issued a Draft Environmental Impact Statement (EIS) to evaluate WSSC's request that its special use permit for operation of Long Draw Reservoir be renewed. The Draft EIS identified four alternatives for the renewal. Alternative B, identified as the Forest Service's proposed action, was the issuance of a special use permit without a bypass flow condition, but with WSSC "voluntarily committing to an operation that would accommodate Forest Plan resource goals" pursuant to the JOP. This alternative did not provide for any stream flow in La Poudre Pass Creek during the winter months.

Alternative C, the "Environmentally Preferred Alternative," was the issuance of a special use permit with a requirement for minimum bypass flows that would mimic the natural flow of La Poudre Pass Creek. Not only did Plaintiffs urge the agency to select Alternative C and object to Alternative B, the Regional Administrator for EPA Region VIII commented that "EPA has Environmental Objections to the proposed Alternative B since it does not impose terms and conditions requiring new bypass and replacement flows necessary to protect aquatic habitat as required by FLPMA." (AR–LD at 1144.) The Park Service also recommended that the Forest Service require "instream flows during the winter season for La Poudre Pass Creek below Long Draw Reservoir." (AR–LD at 711.) The Forest Service's own interdisciplinary team recommended that the Forest Service adopt Alternative C, stating that this alternative "is the only alternative which achieves a reasonable degree of resource protection.... Voluntary measures by the permittees to protect forest resources are not effective." (AR–G at 2584.)

In May of 1994, the cities and WSSC offered the Forest Service a revised JOP which, the government asserts, provided additional environmental benefits when compared with the original JOP. The Final EIS was issued in July of 1994. The government states that because production of the FEIS was substantially complete when the Forest Service received the revised JOP, the revised JOP was addressed in a separate addendum rather than in the main volume of the FEIS. In the FEIS, the Forest Service informs the public that implementation of the proposed action, Alternative B, would require amendment of the Forest Plan provisions calling for the agency "to issue permits with bypass flows and to maintain habitat potential."

The FEIS includes as Appendix I a detailed assessment by the Forest Service of the May 1994 JOP:

> ... [T]he applicants' claims of habitat enhancement in the Cache la Poudre River System are overstated. While the Plan represents an improvement over existing conditions for a five month period, it does not fully mitigate project impacts. At no place does the Plan represent an enhancement above natural conditions that would offset negative effects to aquatic habitat elsewhere. Due to the fact that the JOP is limited to a five-month period, and that no mitigation is proposed for several stream segments, reservoir operations continue to have a detrimental effect on all stream segments evaluated.

(AR–LD at 4483.)

The Forest Service's assessment ultimately concludes that "[c]laims that the JOP results in more aquatic habitat than Alternative C [which requires bypass flows from Long Draw Reservoir] appear to be unfounded from both a physical and biological perspective. In consideration of the facts as we now understand them, there is little question that implementation of Alternative C, as opposed to the Joint Operations Plan, would be in the best interest of National Forest aquatic resources." *Id.*

Ultimately, Forest Supervisor Underwood issued a Record of Decision (ROD) which granted WSSC a land use authorization for the reservoir including the revised JOP as a mitigation measure. (AR–LD at 4581–4607.) The ROD included an amendment to the Forest Plan to exempt Long Draw from Forest Plan requirements. (Amendment No. 20a, AR–LD at 4615.) In disregarding the comments urging the adoption of Alternative C, Supervisor Underwood stated that he reached his decision only after "considerable consultation, deliberation, and reflection upon the proper balance of multiple uses of Federal lands and the appropriate environmental mitigation ...." (AR–LD at 4599.) Six months after the ROD was issued, the Forest Service executed a fifty-year water facility easement to WSSC for the use and operation of the Long Draw Dam and Reservoir expansion area. (AR–LD at 4898–4907.) Plaintiffs challenge these actions.

Plaintiffs' Complaint alleges the following claims for relief: (1) Violation of FLPMA § 505; (2) Violation of National Environmental Policy Act (NEPA) in failing to consider all reasonable alternatives; (3) Violation of NEPA in failing to include all necessary information in the EIS; (4) Violation of NEPA in failing to prepare a supplemental EIS discussing the grant of an easement; (5) Violation of NEPA in failing to prepare a supplemental EIS evaluating the Forest Plan amendment with sufficient particularity; (6) Violation of NEPA in failing to prepare a supplemental EIS evaluating the May 18, 1994 JOP; (7) Violation of the Forest and Rangeland Renewable Resources Planning Act (FRRRPA) in exempting certain facilities from substantive requirements of the

Forest Plan; (8) Violation of FRRRPA in failing to ensure that authorization for use of National Forest system lands be consistent with the Forest Plan; (9) Violation of FRRRPA's implementing regulations in failing to require minimum bypass flows; (10) Violation of FRRRPA in failing to allow public participation in amending the Forest Plan; (11) Violation of the Wilderness Act;[1] (12) Violation of the Wild and Scenic Rivers Act; and (13) Violation of the Administrative Procedures Act (APA) § 553 in failing to subject the Secretary's directive to public notice and comment procedures.

As affirmative defenses, Defendants and Defendant–Intervenors both assert that Plaintiffs have failed to exhaust their administrative remedies with respect to some of their claims. Defendant–Intervenors also argue that the federal Defendants lack the authority to impose water "bypass flow" conditions upon the continued operation of existing water facilities located on National Forest lands. Defendant–Inter-

venors argue that the exercise of this authority by the Forest Service would contradict decisions by Congress to defer to and respect state authority over water allocation and use, and would be contrary to Congressional intent to authorize the National Forest system principally to enhance the quantity of water that would be available for non-federal water users.

## STANDARD OF REVIEW

■ Judicial review of final agency action is made available through the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* A reviewing court may hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In making its determinations, the court is directed to review the whole record or those parts of it cited by a party.[2] 5 U.S.C. § 706. "The APA's arbitrary and capricious standard is a deferential one; administrative determinations

---

1. Plaintiffs voluntarily moved to dismiss this claim with prejudice upon learning that the de-watered zone of the Cache la Poudre is just outside the boundaries of the Comanche Park Wilderness.

2. Both Plaintiffs and Defendant–Intervenors filed motions to supplement the Administrative Record submitted by the agency. Plaintiffs offer a copy of the Record of Decision on the Land Use Authorization for Joe Wright Dam and Reservoir and Amendment to the Land and Resources Management Plan issued on July 29, 1994 (attached to Plaintiffs' motion to supplement at Tab A), a copy of a Decision Memorandum for the Secretary of Agriculture from James R. Lyons, Assistant Secretary, signed on August 15, 1994 by Secretary of Agriculture Michael Espy (attached to motion at Tab B), and a copy of § 1909.12, Forest Plan Implementation and Amendment Process from the Forest Service Handbook. The Court finds it appropriate to supplement the Record with Tab A and the first two pages of Tab B. Tab C will be treated as a courtesy attachment for the Court.

Defendant–Intervenors offer five documents to which there is no objection: WSSC's Decrees dated 12/18/45, 4/24/79, and 5/12/86; a FEIS for Long Draw Reservoir Enlargement Project dated 2/7/73; and a DEIS for Long Draw Reservoir Enlargement Project dated 6/6/72. Those documents are accepted. In addition, Intervenors offer eight documents relating to an application for water rights filed by the United States in the District Court for Water Division No. 1, State of Colorado, for federal lands including Roosevelt National Forest and Rocky Mountain National Park. The Court agrees with Plaintiffs that supplementation of the record with these eight documents is inappropriate because the Forest Service did not rely upon these documents in making its decision to grant the right-of-way permit at issue. As discussed in Section B of this order, the issue of reserved water rights is wholly unrelated to the Federal Government's right to regulate and manage Federal lands.

may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. United States Dept. of Transp.,* 305 F.3d 1152, 1164 (10th Cir.2002).

In determining whether the agency acted in an arbitrary and capricious manner, we must ensure that the agency decision was based on a consideration of the relevant factors and examine whether there has been a clear error of judgment. ... We consider an agency decision arbitrary and capricious if the agency ... relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1167 (10th Cir.1999) (internal quotations and citations omitted).

### DISCUSSION

#### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ Section 10(c) of the Administrative Procedure Act (APA), 5 U.S.C. § 704(c), requires exhaustion of administrative appeals where mandated either by statute or agency rule. The Forest Service regulations expressly require administrative appeal of a decision documented in a Record of Decision before judicial review may occur. 36 C.F.R. § 215.7 (1994). Under these regulations, an appellant must file a written appeal which provides sufficient written evidence and rationale to show why the decision should be remanded or reversed. 36 C.F.R. § 215.14(a) (1994). The regulations require an appellant to both identify the specific changes in the decision that the appellant seeks, or portion of the decision to which the appellant objects, and state how the appellant believes the decision violates the law, regulation or policy. 36 C.F.R. § 215.14(b)(4) & (b)(5) (1994). "[T]he claims raised in the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Kleissler v. U.S. Forest Serv.,* 183 F.3d 196, 202 (3rd Cir. 1999). Other courts have applied the APA's statutory exhaustion requirement based on the part 215 regulations to dismiss claims. *See, e.g., Wilderness Society v. Bosworth,* 118 F.Supp.2d 1082, 1099–1101 (D.Mont.2000); *Shenandoah Ecosystems Defense v. U.S. Forest Serv.,* 144 F.Supp.2d 542, 556–57 (W.D.Va.2001); *Friends of the Earth v. U.S. Forest Serv.,* 114 F.Supp.2d 288, 291 (D.Vt.2000).

■ On September 13, 1994, Plaintiffs submitted a Notice of Appeal and Statement of Reasons regarding the land-use authorization issued for Long Draw Dam and Reservoir. That Notice spanned 27 pages of text. (AR–LD 5114–41.) Plaintiffs' Second Claim for Relief alleges the Forest Service violated NEPA by failing to consider all reasonable alternatives, specifically an alternative requiring "bypass flows designed to meet Forest Plan requirements." Plaintiffs' Fifth Claim alleges a violation of NEPA by failing to prepare a supplemental EIS that sufficiently evaluated the Forest Plan amendment. Plaintiffs maintain that they "generally allege[d]" such NEPA violations in their Notice of Appeal by stating that "a supplemental draft EIS should have been prepared and circulated for public comment," that "the draft EIS ... did not include any relevant information on the alternative finally selected by the Forest Service," and that "[t]here are other inade-

quacies in the FEIS as well." (AR–LD at 5121.) These allegations are not sufficiently similar to the allegations that are the basis for Plaintiffs' Second and Fifth Claims for Relief before this Court so as to put the agency on notice of, and provide an opportunity to consider and decide, such claims.

■ Plaintiffs' Ninth Claim for Relief alleges the Forest Service violated its "viability regulation," 36 C.F.R § 219.19 (1994). Plaintiffs do not dispute that they failed to cite that regulation in their Notice but instead argue that they raised the concept behind that regulation by alleging that "the Forest Service regulations that sanction plan amendments cannot authorize the total suspension of all standards and guidelines for species protection . . . ." Standards and guidelines are components of a Forest Plan; therefore, referencing them generally does not put the agency on notice of Plaintiffs' specific claim regarding the viability regulation.

■ Plaintiffs' Thirteenth Claim for Relief asserts that the Forest Service failed to subject the Madigan directive to public notice and comment procedures before implementing the directive in the ROD, in violation of APA § 553. Plaintiff's Notice of Appeal failed to even mention the Madigan directive. Instead, Plaintiffs argue that their repeated assertions that "the forest plan amendment suspends standards for protecting species habitat" should have put the agency on notice that they wished to take issue with the Madigan directive. Such references do not expressly challenge the directive itself, nor do they suggest Plaintiffs' present claim that the directive should have been subjected to the APA's public notice and comment procedures. The Court finds that such vague references are patently insufficient to put the Forest Service on notice of Plaintiffs' Thirteenth Claim for Relief.

Plaintiffs also maintain that they preserved this claim for review by raising their concern about the Madigan directive in numerous comment letters sent prior to the submission of the Notice of Appeal. Where an issue is raised in a comment letter but not in a subsequent administrative appeal, the logical conclusion is that the agency's response satisfactorily addresses the issue or the appellant has otherwise decided the issue was no longer worth pursuing. Allowing judicial review of issues raised solely in comment letters turns that logic on its head and generates needless paperwork. Instead of being able to assume that an administrative appeal addresses all the issues an appellant wishes to pursue, administrative agencies would have to fish through all the appellants' comment letters for issues that might have been raised and then address those issues in its administrative decision—even though the appellant may no longer be interested in pursuing the issue. This Court does not countenance such a result.

■ Defendant–Intervenors also argue that Plaintiffs did not sufficiently raise, in their Notice of Appeal, the issue addressed in their Tenth Claim for Relief. Plaintiffs' Tenth Claim alleges a violation of NFMA by failing to allow public participation in amending the Forest Plan. However, Plaintiffs stated,

Neither the notice issued regarding the Long Draw Dam and Reservoir land-use authorization, nor the vague statements contained in the DEIS that adoption of Alternative B would require amendment of the forest plan were sufficient to notify the public that the Forest Service intended to remove the 40 percent habitat protection guideline in its entirety from sections of the Forests. NEPA requires full disclosure of an action with such serious environmental impacts. *Moreover, under Forest Service regula-*

*tions, amendment of a forest plan requires notice and comment procedures.* 36 C.F.R. § 219.10(f).

(AR–LD at 5128) (emphasis added).

The Court finds that the foregoing paragraph, albeit in a footnote at page 14 of their Notice, was sufficient to put the Forest Service on notice of the alleged failure to allow public participation in amending the forest plan.

██ Plaintiffs argue that they should be excused from the exhaustion requirement because further agency appeal would have been futile in this situation, and the claims raise issues of statutory interpretation. Plaintiffs argue that appeal of the issues they failed to raise in their administrative appeals would have been futile because the "Forest Service was clearly biased against Plaintiffs, as demonstrated by the Madigan memorandum." However, the Court cannot simply "presume the agency would not have provided [Plaintiffs] with an adequate remedy had the issue been raised before it." *Bd. of County Comm'rs of the County of Adams v. Isaac,* 18 F.3d 1492, 1499 (10th Cir.1994). The existence of the Madigan memo does not demonstrate the Forest Service had predetermined that bypass flows would not be imposed. Indeed, even when the Madigan directive was in effect, the agency did not read the memorandum as prohibiting bypass flows in all cases—on the very same day the agency declined to impose a bypass flow in reauthorizing Long Draw Reservoir, it did include a bypass flow in the reauthorization of Joe Wright Reservoir.

██ Plaintiffs also argue that the exhaustion requirement does not apply because the issues in question involve statutory interpretation. The Tenth Circuit has recognized, "The general rule requiring exhaustion of remedies before an adminis-

trative agency is subject to an exception where the question is solely one of statutory interpretation." *Frontier Airlines, Inc. v. Civil Aeronautics Bd.,* 621 F.2d 369, 371 (10th Cir.1980). On the other hand, "[e]xhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The Court disagrees with Plaintiffs' assertion that the unexhausted claims are purely a matter of statutory interpretation.

Plaintiffs argument fails because resolution of these claims requires application of law to facts developed in the administrative record. *See Rocky Mountain Oil & Gas Ass'n v. Watt,* 696 F.2d 734, 744 (10th Cir.1982) (distinguishing the question of pure statutory construction that was before it from a question where a factual administrative record would be essential to the court's determination). Here, Plaintiffs' Second Claim requires examination of the alternatives developed by the agency and a comparison of those alternatives with that Plaintiffs insist the agency should have considered. *See Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515, 1528 (10th Cir.1992). Similarly, Plaintiffs' Fifth Claim cannot be resolved without considering the scope and nature of the amendment to determine whether it is significant for the purposes of the National Forest Management Act, and the Ninth Claim requires interpretation of the agency's species viability regulation. Likewise, Plaintiffs' Thirteenth Claim requires an evaluation of whether the Madigan directive was implemented by the Forest Service as if it were a binding rule in reaching a decision on the Long Draw Reservoir.[3]

**3.** Defendants contend that Plaintiffs' Thir- teenth Claim is moot because the Madigan

Plaintiffs failed to raise the issues addressed in their Second, Fifth, Ninth and Thirteenth Claims for relief in their administrative appeal. Accordingly, those claims must be dismissed for failure to exhaust their administrative remedies.

### B. FOREST SERVICE'S AUTHORITY TO IMPOSE BYPASS FLOWS

Defendant–Intervenors, as well as certain *amicus* parties, assert that the issue at the heart of this case is whether Congress has authorized the Forest Service to prohibit historic diversions of water by non-federal parties in order to make water available for downstream use by the Forest Service for fish and wildlife habitat protection. Intervenors contend that Congress has *not* granted to the Forest Service the authority to impose bypass flow conditions in order to reallocate water from existing uses to unmet National Forest needs. In support of their contention, Intervenors assert, first, that the exercise of this authority by the Forest Service would contradict the repeated and explicit decisions by Congress to defer to and respect state authority over water allocation and use. Second, Intervenors assert that the imposition of bypass flow requirements on existing water uses would be contrary to Congressional intent to authorize the National Forest system principally to enhance the quantity of water that would be available for nonfederal water users. Third, Intervenors argue that the statutes upon which Plaintiffs rely for a grant of bypass flow authority to the Forest Service do not support this claim, and in fact explicitly and broadly disclaim any agency authority to affect existing nonfederal uses of water or to interfere with state control over the allocation and use of water. In-

tervenors further argue that these statutes also limit the exercise of Forest Service authority by making it subject to valid existing rights such as existing water rights and facilities. Finally, Intervenors assert that the use of bypass flow requirements by federal agencies to obtain water for federal purposes is inconsistent with the McCarran Amendment, 43 U.S.C. § 666, by which Congress established a unified and all-inclusive method to allocate the use of water between federal and non-federal water uses, including the riparian uses which Plaintiffs seek to protect in this case. Consequently, Intervenors contend, the failure of the Forest Service to impose conditions beyond its legal authority cannot provide the basis for Plaintiffs' claims that the Forest Service has violated procedural or substantive requirements of law.

The Government Defendants contend that the Forest Service's authority to establish bypass flows as a condition to the use of Forest Service land rests on two significant principles. First, when the Forest Service requires bypass flows it is imposing a condition on the use of federal land rather than asserting a water right. Second, a Colorado water right carries with it no right to the use of federal land. Defendants argue that the Forest Service has broad regulatory authority to impose conditions on the use of its land even when those conditions affect private water rights. Defendant assert that this authority arises from three sources: (1) the Organic Act of 1897, which granted the agency broad authority to impose conditions on the occupancy and use of National Forest land; (2) FLPMA, in which Congress granted the agency authority to issue and condition rights-of-way on National Forest

directive was repealed well before this lawsuit was even filed. Although Plaintiffs argue throughout their briefing that the Madigan directive is evidence of the arbitrary and capriciousness of the Defendants' decision, their

Thirteenth Claim challenges the procedures in allegedly adopting this binding rule as violative of the APA. Such a claim is moot because the Madigan directive no longer affects agency decision-making.

lands; and (3) the agency's proprietary capacity, which also allows the agency to impose terms and conditions on the use of National Forest lands. Similarly, Plaintiffs contend that the Forest Service has the authority to issue special-use permits requiring bypass flows under specific grants of power under FLPMA and the Organic Act, and the United States' inherent powers as property owner.

Intervenors rely on *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), in asserting that Congress intended that water for fish and wildlife protection purposes be appropriated by the Forest Service in priority and subject to the rights of prior users. In *U.S. v. New Mexico*, the Supreme Court stated,

> Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.

*Id.* at 702, 98 S.Ct. 3012.

The Supreme Court determined that, pursuant to the Organic Act of 1897, Congress intended national forests to be reserved for only two purposes—to conserve the water flows, and to furnish a continuous supply of timber for the people. *Id.* at 707, 98 S.Ct. 3012. "National forests were not to be reserved for aesthetic, environmental, recreational, or wildlife-preservation purposes." *Id.* at 708, 98 S.Ct. 3012. In 1960, Congress passed the Multiple–Use Sustained–Yield Act (MUSYA), which

provides that the national forests shall be administered for additional purposes, including wildlife and fish. However, the *New Mexico* Court concluded that while MUSYA "was intended to broaden the purposes for which national forests had previously been administered, ... Congress did not intend to thereby expand the reserved rights of the United States." *Id.* at 713, 98 S.Ct. 3012. The Court noted that a reservation of additional water for *secondary* purposes "could mean a substantial loss in the amount of water available for irrigation and domestic use, thereby defeating Congress' principal purpose of securing favorable conditions of water flow." *Id.* at 715, 98 S.Ct. 3012.

While finding that Congress did not, in enacting the Organic Act and MUSYA, intend to reserve water rights for wildlife preservation purposes when it set aside lands for national forests, *U.S. v. New Mexico* did not address the power of the Forest Service to restrict the use of rights-of-way over federal land for fish and wildlife purposes. *County of Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081, 1086 (9th Cir.2003). In *County of Okanogan*, the appellants argued that the Forest Service did not have the authority to condition the use of the rights-of-way in a national forest on the maintenance of instream flows because such restrictions denied them their vested water rights under state law. The Ninth Circuit Court of Appeals rejected that argument, finding that the imposition of such restrictions in the right-of-way permits was within the authority of the Forest Service. The Ninth Circuit found such authority in FLPMA, NFMA, the Organic Act, and MUSYA.

> The Federal Land Policy and Management Act of 1976 (FLPMA) authorizes the Secretaries of the Interior and Agriculture to "grant, issue, or renew rights-of-way over, [upon, ... or through such

lands for reservoirs, canals, ditches, ... and other facilities and systems for the impoundment, storage, transportation, or distribution of water."] 43 U.S.C. § 1761(a)(1). Such rights-of-way "shall contain ... terms and conditions which will ... minimize damage to ... fish and wildlife habitat and otherwise protect the environment" and that will "require compliance with applicable ... water quality standards established by or pursuant to applicable Federal or State law." *Id.* § 1765(a). In addition, the National Forest Management Act requires the Forest Service to specify guidelines for land management plans that "provide for ... watershed, wildlife, and fish" and "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(A) & (B). The Organic Administration Act, 16 U.S.C. § 475, provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows ...." The Multiple Use Sustained-Yield Act of 1960 (MUSYA), 16 U.S.C. § 528, provides that "[i]t is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." *These statutes, in our view, give the Forest Service authority to maintain certain levels of flow in the rivers and streams within the boundaries of the Okanogan National Forest to protect endangered fish species.* County of Okanogan, 347 F.3d at 1085 (emphasis added).

Like the Defendant–Intervenors here, the appellants in *County of Okanogan* argued that the "savings clauses"[4] of FLPMA is evidence that Congress did not intend to diminish any vested water rights guaranteed under state law. The Ninth Circuit court dismissed this argument, noting that the appellants' rights-of-way were always, by their written terms, revocable at the discretion of the federal government. Moreover, the 1901 Act under which the permits had been earlier granted provided that right-of-way permits did not grant vested property rights. *Id.* at 1085–86. Ultimately, the *Okanogan* court concluded that that case was "not a controversy over water rights, but over rights-of-way through lands of the United States, which is a different matter, and is so treated in the right-of-way acts before mentioned." *Id.* at 1086 (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 411, 37 S.Ct. 387, 61 L.Ed. 791 (1917)).

The Tenth Circuit has recognized that the Forest Service's authority over its lands may be exercised to limit a water right holder's use of water. *See City and County of Denver v. Bergland*, 695 F.2d

---

**4.** Those clauses provide in pertinent part:

(a) Nothing in this Act ... shall be construed as terminating any valid lease, permit, ... right-of-way, or other land use right or authorization existing on the date of approval of this Act [October 21, 1976].

(g) Nothing in this Act shall be construed as limiting or restricting the power and authority of the United States or -

(1) as affecting in any way any law governing appropriation or use of, or Federal right to, water on public lands;

(2) as expanding or diminishing Federal or State jurisdiction, responsibility, interests, or rights in water resources development or control;

(4) as superseding, modifying, or repealing, except as specifically set forth in this Act, existing laws applicable to the various Federal agencies which are authorized to develop or participate in the development of water resources or to exercise licensing or regulatory functions in relation thereto;

(h) All actions by the Secretary concerned under this Act shall be subject to valid existing rights.

FLPMA § 701(a), (g)(1,2,4) & (h), Historical Note, 43 U.S.C. § 1701.

465 (10th Cir.1982). There the Tenth Circuit rejected Denver's argument that its water rights prevented the Forest Service from regulating the right-of-way upon which the city was building a water transmission system. *Id.* at 483. The Court of Appeals held that although the water decree, determining the priority of water rights, prohibited the Forest Service from challenging Denver's right to appropriate those waters, it had no effect on the agency's ability to regulate Denver's use of National Forest lands—despite Denver's claims that the Forest Service was interfering with its right to divert and utilize the water. *Id.* at 483–84. In doing so, the Tenth Circuit recognized both that the law had long held that a water right did not include the right to use another's land and that the Organic Act "conferr[ed] upon the Forest Service the duty to protect the forests from injury and trespass, *and the power to condition their use* and prohibit unauthorized uses." *Id.* at 476, 483–84 (emphasis added). *See also Diamond Bar Cattle Co. v. United States,* 168 F.3d 1209 (10th Cir.1999) (affirming a district court's finding that "Whether Plaintiffs own certain water rights ... does not change the fact that such rights do not deprive the Forest Service of its statutory authority and responsibility to regulate the use and occupancy of National Forest System lands ....").

■ Title V of FLPMA repealed over thirty statutes which had granted rights-of-way across federal lands and replaced them with a single grant of authority to the Secretaries of Agriculture and the Interior to "grant, issue, or renew rights-of-way over, upon, under, or through" public and National Forest Lands. 43 U.S.C. § 1761(a). Congress' grant of authority included the obligation to include terms and conditions in each right-of-way which will, *inter alia,* "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a). The Forest Service's exercise of its regulatory authority to impose bypass flows as a condition on the use of National Forest land does not constitute the assertion of a water right.

The argument that imposition of bypass flows implicates or conflicts with state water rights has been rejected by the Supreme Court in *PUD No. 1 v. Washington Dept. of Ecology,* 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994). In that case, PUD No. 1 argued that a minimum instream flow requirement imposed pursuant to the federal Clean Water Act ran afoul of disclaimers provided in that act which preserved the state's authority to allocate water rights.[5] *Id.* at 720, 114 S.Ct. 1900. The Court rejected that argument, holding that the disclaimers "preserve the authority of each State to allocate water quantity as between users," but did not limit the scope of federal regulation (in that case pollution controls) that may be imposed on users with water rights obtained under state law. In doing so, the Court recognized that the regulatory action under federal law (minimum stream flow requirements) did not interfere with the state allocation because it neither "reflected nor established" a water right. *Id.* at 720–21, 114 S.Ct. 1900.

■ Like the CWA certification required in *PUD No. 1,* the authorization for

---

5. The disclaimers in the CWA are similar to the savings clauses in § 701(g) of FLPMA. Section 101(g) of the CWA provides: "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter." 33 U.S.C. § 1251(g). Similarly, § 510(2) provides that nothing in the CWA shall "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters ... of such States." 33 U.S.C. § 1370.

the use of federal land required in this case represents a federal action that is a prerequisite to the use of a water right obtained under state law. A review of the foregoing authorities convinces this Court that, on the rare occasions when bypass flows are required as a condition to the use of federal lands, they neither reflect nor establish a water right; rather, they merely address the nature of the use to which a water right might be put once the right is obtained from the State. *Id.* at 721, 114 S.Ct. 1900. Thus, pursuant to its regulatory authority, the Forest Service could have imposed bypass flows as a condition to the renewal of WSSC's authorization for Long Draw Reservoir.

## C. FEDERAL LAND AND POLICY MANAGEMENT ACT

In his Record of Decision, Supervisor Underwood stated,

> Section 505 of FLPMA, requires me to protect the public interest in the lands traversed by the right-of-way or adjacent thereto. I considered that responsibility, and I conclude that I have the authority to impose winter bypass flows below the dam to protect the Park. However, in my discretion, I have balanced the public's interest in water facilities and the environment.

(AR–LD at 4603.)

Plaintiffs argue that Defendants' decision to grant the Long Draw Easement without requiring the maintenance of minimum bypass flows was arbitrary, capricious, an abuse of discretion and not in accordance with FLPMA. Specifically, Plaintiffs argue that the easement does not carry out the purposes of FLPMA and will cause significant damage to fish and wildlife. Plaintiffs maintain that the Forest Service does not have authorization to bal-

ance local business concerns with the protection of the environment. Plaintiffs further contend that FLPMA's requirement that rights-of-way include terms and conditions that will "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment" mandates that WSSC's authorization include the requirement for minimum bypass flows. Plaintiffs also contend that the Forest Service wrongfully relied on the illegally promulgated regulation issued by Secretary Madigan.

The government responds that FLPMA is not focused solely on protecting the environment. The government argues that the Forest Service has discretion when implementing the requirements of FLPMA, and that national forest lands are managed under a congressional multiple-use and sustained-yield mandate. The government also argues that the record supports its decision. Defendant discounts the Madigan Policy asserting that it did not control its decision.

As set forth previously, Section 505 of FLPMA states: "Each right-of-way shall contain—(a) terms and conditions which will (I) carry out the purposes of this Act and rules and regulations issued thereunder; [and] (ii) minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment . . . ."[6] 43 U.S.C. § 1765. The Forest Plan suggests that the Forest Service determined that the most appropriate way to minimize damage to fish habitat is to maintain such habitat at least at 40 percent or more of potential, requiring the Forest Service to "manage waters capable of supporting self-sustaining trout populations to provide for those populations." The purposes of FLPMA include: (1) the

---

**6.** FLPMA § 103(f) defines "right-of-way" as "an easement, lease, permit, or license to occupy, use, or traverse public lands granted for the purpose listed in subchapter V of this chapter." 43 U.S.C. § 1702(f).

establishment of goals and objectives "as guidelines for public land use planning, and that management be on the basis of multiple use and sustained yield unless otherwise specified by law;" and (2) management of public lands in a manner "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.]" 43 U.S.C. § 1701(a)(7) & (8).

The evidence in the Administrative Record clearly shows that requiring bypass flows was the environmentally preferred alternative. Following a comprehensive assessment of the revised JOP, which was the applicants' attempt to mitigate damage to fish habitat, the Forest Service found that "the applicants' claims of habitat enhancement in the Cache la Poudre River system are overstated." (AR–LD at 4483.) More specifically, the Forest Service stated:

> Under the JOP, effects to ... Segment 5 of the La Poudre Pass Creek, and to Segment 6 of the Cache la Poudre River remain unchanged from the existing condition. As these negative impacts are considered at increasingly larger scales ... they become less apparent. However, at the local scale, we believe these are significant environmental effects that are meaningful from a physical, biological, and ecological perspective. Effects to [these segments] are not mitigated under the JOP, but are fully to partially mitigated under Alternative C for a five month period.

(AR–LD at 4482–83.)

Additionally, the ROD itself recognized that the "JOP is not as environmentally desirable as bypass flows" because "[c]ritical habitat conditions occur during months outside those addressed in the JOP.... These months are of equal importance to maintaining aquatic habitat." (AR–LD at 4601.)

> Under the current operation of Long Draw Reservoir there are extended periods of zero or near zero flow below the reservoir from at least October through March or April, and longer during some years:.... The extended periods of zero to near zero flow result in zero habitat potential.... It is unlikely that viable self-sustaining fish populations will exist immediately below Long Draw Dam. This condition persists for approximately 1.2 miles downstream and possibly farther. Progressing downstream, aquatic habitat conditions improve somewhat as ground water contributions and tributary inflow occur, but the amount of aquatic habitat for fish remains marginal. The average size and abundance of trout are reduced for the entire 2.3 mile section of stream between Long Draw Dam and the Cache la Poudre River.

(AR–LD at 4593.)

Despite the evidence before him, Supervisor Underwood did not select the environmentally preferred alternative "because WSSC offered *voluntary* mitigation toward meeting Forest Service resource goals in the JOP that *reasonably protects* NFS lands." (AR–LD at 4597) (emphasis added). Concerned by the fact that the Long Draw Reservoir is part of an irrigation water supply upon which many people depend, the Forest Supervisor concluded,

> Water uses continue to be a welcome and legitimate use of the public's lands, just as they have been for decades.... I desire to accept voluntary measures that reasonably protect resources on public land.... My job is to find a balance between the use of NFS lands for water

**1108**

facilities and protection of aquatic resources.

(AR–LD at 4601.)

The Supervisor's ROD goes on to discuss the difficulties WSSC would face in implementing bypass-flows, including upgrading the outlet works on the Long Draw Dam to operate during the winter months. *Id.* ("WSSC is concerned about the difficult winter access and thinks that is another reason that winter operation is neither feasible nor safe.") Finally, the Supervisor concluded that "[o]ne of the assurances that I have received from WSSC that makes the JOP acceptable is WSSC's willingness to have the JOP be a condition of the land-use authorization." *Id.*

■ FLPMA itself does not authorize the Supervisor's consideration of the interests of private facility owners as weighed against environmental interests such as protection of fish and wildlife habitat. FLPMA *requires* all land-use authorizations to contain terms and conditions which will protect resources and the environment. In responding to public comments, the Forest Service expressly acknowledged that issuing a special use authorization without terms and conditions requiring by-pass flows, "depending instead on voluntary achievement of Forest Plan objectives appears to be inconsistent with FLPMA." (AR–LD at 3162.) "Once it is determined that certain resources are at risk and require such terms and conditions to protect them, then neglecting to include the terms and conditions in the authorization, as proposed in Alternative B, would be inconsistent with FLPMA." *Id.* The Act simply does not allow a forest supervisor to ignore options that would minimize environmental degradation because of the costs to private parties and difficulty in implementation.

The Government argues that the obligations of § 505 of FLPMA must be placed in the context within which the Forest Service operates when fulfilling its statutory obligations of "multiple use." The Government contends that meeting the mitigation requirements of FLPMA is a case-by-case determination controlled not only by the terms of § 505, but also by the terms of the other statutes governing the National Forest lands: the Organic Administration Act, the Multiple–Use, Sustained–Yield Act, and the National Forest Management Act. Thus, the Government argues, Supervisor Underwood clearly had the discretion to engage in balancing as he considered the requirements of § 505.

■ Even assuming that the Forest Service was entitled to balance environmental interests against the use of Forest lands for water facilities, its explanation for its decision runs counter to the evidence before the agency. After identifying Alternative B (without bypass flows) as the proposed action, the Forest Service received numerous comments from within the federal government condemning its decision. For example, the Environmental Protection Agency (EPA) stated that the voluntary solution proposed by permittees is "clearly insufficient to meet the FLPMA, [Endangered Species Act] and [Clean Water Act] objectives." (AR–G at 2324.) The EPA further asserted that any claim that bypass flows would result in a loss of historic yield was unsubstantiated.

This is particularly so since each of these permittees seems to have the flexibility to subsequently capture and store bypassed flow in lower reservoirs using existing water storage without significant change in their flexibility to store stream flow. Further, the concern that the capital investment in these facilities would be lost or diminished in value requiring significant new investment has not been documented.

*Id.*[7]

The Court finds that the administrative record is devoid of any verifiable evidence, save conclusory predictions by WSSC, that the imposition of bypass flows pursuant to Alternative C would adversely affect its ability to fully utilize the Long Draw Reservoir.

The Forest Service's own interdisciplinary (ID) team pointed out the inherent weaknesses of the JOP's supposed strong points. In order to trumpet the value of its plan, the WSSC claimed that the JOP would result in "winter aquatic habitat ... improve[ments] over existing conditions by approximately 20% overall." (AR–G at 4350.) However, no independent study was ever completed by the Forest Service to assess the environmental impact of the JOP. The Forest Service's ID team discounted claims made by the WSSC about the effectiveness of the JOP, concluding that:

> [T]he applicants' data should not be considered accurate in terms of absolute values and should be used only as an index to assess relative differences among the alternatives presented. It is also important to understand that emphasis placed on the analysis done by the Cities was to compare differences in fish habitat between Alternatives B and C for a five month period only, and does not consider other time periods or other resource values.

(AR–LD at 4461.)

Furthermore, while the JOP increased flows to the Cache la Poudre River, the plan only required WSSC, "[t]o the extent water is available in storage and can be put to beneficial use, [to release water] from Barnes Meadow and Chambers Lake Reservoirs at a target rate of 10 cfs for the period of November 1 through March 31 each year." (AR–G at 4354.) Therefore, any mitigation afforded by the JOP accrues only downstream on the mainstem of the Cache la Poudre River. By increasing flow from other reservoirs to the River, the plan's very terms do not mitigate the environmental damage to the La Poudre Pass Creek, which remains dry during the winter months.

On the same day the ROD for Long Draw Reservoir was issued, the Forest Service also issued a ROD for the Joe Wright Dam and Reservoir. (*See* Joe Wright ROD attached at Tab A to Memo. in Support of Plaintiffs' Motion for Summ. J.) Unlike the Long Draw Easement, however, the renewed land-use authorization for the Joe Wright Dam and Reservoir required the maintenance of a "bypass flow of three (3) cfs from April 1 through September 30, and a bypass flow of one (1) cfs from October 1 through March 31 (or natural flows, whichever is less) in Joe Wright Creek directly below Joe Wright Reservoir." *Id.* at 1. As he did in the Long Draw ROD, Forest Supervisor Underwood recognized that FLPMA directed him to put terms and conditions in land-use authorizations to protect fisheries. *Id.* at 10.

The Forest Supervisor determined that bypass flows were required under the Joe Wright permit because:

> Aquatic habitat conditions on NFS lands below Joe Wright Reservoir are marginal.... There remain up to eight months

---

7. The EPA also stated that bypass flows are "a significant factor in ensuring satisfaction of [Clean Water Act] objectives, and we support the alternatives in the EISs which include bypass flows. The proposed bypass flows, which are aimed at achieving a 40 percent level of aquatic habitat protection, appear to

be reasonable in terms of ensuring a minimal, but adequate level of protection." (AR–G at 2742.) The Forest Service's Fishery Biologist similarly warned that if bypass flows were not implemented, the Service would not likely "meet the intent of existing environmental law." *Id.* at 2449.

of zero or near zero flows. In the half-mile section immediately below the reservoir the habitat potential for all life stages of all fish species is zero. Viable self-sustaining fish populations do not exist for 1.0 miles downstream and possibly farther. I wanted to find a balance between the use of NFS lands for water diversions and protecting the aquatic resources, but the JOP does not provide the minimum acceptable levels of resource protection that I desire.

*Id.* at 11.

Supervisor Underwood declined to require bypass flows from the Long Draw Reservoir, despite similar conclusions concerning zero flow conditions and destruction of aquatic habitat. (AR–LD at 4593.)

The Forest Supervisor determined that the voluntary mitigation offered by the applicants in this case *reasonably* protects NFS lands. However, the clear weight of the evidence in record does not support a finding that Alternative B, even with the JOP mitigation measures, *minimizes* damage to fish and wildlife habitat and otherwise protects the environment as required by FLPMA. Therefore, the Forest Service's selection of this alternative in issuing a land-use authorization for Long Draw Dam and Reservoir was arbitrary and capricious.

D. NATIONAL ENVIRONMENTAL POLICY ACT (NEPA)

■ Plaintiffs' remaining claims pursuant to NEPA are: (1) failure to include all necessary information in the EIS; (2) failure to prepare a supplemental EIS discussing the grant of an easement; and (3) failure to prepare a supplemental EIS evaluating the May 18, 1994 JOP. NEPA requires all federal agencies to use a "systematic, interdisciplinary approach" in agency decision-making. *Utah Shared Access Alliance v. U.S. Forest Service,* 288 F.3d 1205, 1207 (10th Cir.2002).

NEPA places upon federal agencies the obligation "to consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). It also ensures that an agency will inform the public that it has considered environmental concerns in its decision-making process. *Id.* The Act does not require agencies to elevate environmental concerns over other appropriate considerations; however, it requires only that the agency take a "hard look" at the environmental consequences before taking a major action.... The role of the courts in reviewing compliance with NEPA "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec.,* 462 U.S. at 97–98, 103 S.Ct. 2246.

*Id.* at 1207–08.

1. *Failure to include all necessary information in the EIS*

■ Plaintiffs fault the Forest Service for amending the Forest Plan while acknowledging "detailed flow and habitat assessments have not been conducted for the Cache la Poudre River between La Poudre Pass Creek and Joe Wright Creek to determine consistency with Forest Plan standards." (AR–LD at 4603.) Plaintiffs urge such studies were necessary to determine whether that portion of the Cache la Poudre could be exempted from the Forest Plan standards.

■ NEPA regulations require agencies to include complete information in an environmental impact statement "[i]f the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice

among alternatives and the overall costs of obtaining it are not exorbitant." 40 C.F.R. § 1502.22(a). To demonstrate a violation of NEPA on this basis, Plaintiffs must show (1) the missing information is essential to a reasoned decision between the alternatives, and (2) that the public was unaware of the limitations of the data the Forest Service relied on. *See Colorado Environ. Coalition v. Dombeck,* 185 F.3d 1162, 1172–73 (10th Cir.1999). Plaintiffs have made no attempt to demonstrate that such information is essential to a reasoned decision. The record demonstrates that the Forest Service had information addressing aquatic habitat and explained the limitations of the information it relied on.

When the water users presented the revised JOP to the Forest Service, they also included extensive analysis done by their hydrology and fishery consultants which compared Alternative B(JOP) with Alternative C (bypass flows). (AR–G at 4364–4620.) The Forest Hydrologist and Fishery Biologist evaluated the consultants work in a report included as Appendix I to the FEIS. (AR–LD at 4459–4563.) The Forest Service analysts cautioned that because the habitat results generated by the consultants relied on limited data, the results "should not be considered accurate in terms of absolute values." *Id.* at 4461. That limitation, however, did not mean the consultants' analysis had no value in the decision-making. The analysis provided "an index to assess relative differences among the alternatives presented." *Id.* Plaintiffs have not demonstrated that NEPA regulations required inclusion of the missing information.

2. *Failure to prepare a supplemental EIS*

 NEPA regulations provide that federal agencies "[s]hall prepare supplements to either draft or final environmental impact statements if: (i)[t]he agency makes substantial changes in the proposed

action that are relevant to environmental concerns; or (ii)[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). This requirement does not mean that a SEIS must be done every time an agency is presented with new information. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Instead, an SEIS is only required if the new information shows the proposed action will affect the quality of the human environment in a significant manner or to a significant extent not already considered. *Id.* at 374, 109 S.Ct. 1851.

 Plaintiffs first contend that the Forest Service should have issued a supplemental EIS before adopting the May 18, 1994 JOP, because the public was given no opportunity to comment on the revised JOP. Where the agency has been presented with new information, an agency's decision to forego a SEIS must be upheld so long as the record demonstrates the agency reviewed the proffered supplemental information, evaluated the significance—or lack of significance—of the new information, and provided an explanation for its decision not to supplement the existing analysis. *Colorado Environ. Coalition,* 185 F.3d at 1178. Because the Forest Service had substantially completed the FEIS when the revised JOP was submitted, it produced an addendum to the FEIS addressing the revised JOP (AR–LD at 4565–66), and the Forest Fisheries Biologist and Forest Hydrologist collaborated on an extensive analysis of its impacts (*Id.* at 4459–4563).

The addendum explains that the IDT considered whether to issue a supplemental EIS and determined that doing so was not necessary "because the revised proposal did not make substantial changes to the

proposed action or present significant new circumstances." *Id.* at 4565. Although Plaintiffs characterize the JOP and the revised JOP as "vastly different", they offer no explanation to support that characterization. The IDT concluded the revised JOP did not represent a substantial change from the initial JOP for two reasons: (1) the revised JOP was an environmental improvement; and (2) two key elements remained the same between the two draft proposals. *Id.* As the IDT observed, both the initial JOP and the revised JOP mitigate by increasing the water flow in the mainstem Cache la Poudre River, and both proposals left La Poudre Pass Creek below Long Draw Reservoir dewatered for several months of the year. *Id.*

In the ROD, Supervisor Underwood further explained the decision not to issue a supplemental EIS:

> I also had to consider whether or not to issue a Supplement to the DEIS to give the public an opportunity to review and comment on the revised JOP. Our analysis of the original proposal in the DEIS focused on the fact that La Poudre Pass Creek below Long Draw Reservoir would be dewatered six months of the year. That was the significant issue identified in the DEIS. Although the revised plan did propose to put more water in the lower Cache la Poudre River below the confluence with Joe Wright Creek, it did not change the effects on the stretch below Long Draw Dam. The revised JOP is within the range of alternatives the public should have reasonably anticipated and the public's comments on the draft EIS alternatives also apply to the revised JOP. The public's comments on the DEIS meaningfully informed me of the public's attitudes toward granting land-use authorizations and the terms and conditions that should be applied. For those reasons I determined that a Supplemental EIS was not required under 40 CFR 1502.9.

(AR–LD at 4597.)

The record demonstrates that the Forest Service reviewed the revised JOP, evaluated the significance—or lack of significance—of the new information, and provided an explanation for its decision not to supplement the existing analysis. Thus, the Forest Service's decision that a SEIS was not required is not arbitrary and capricious.

 Plaintiffs also argue that the Forest Service should have issued a SEIS when it chose to grant an easement rather than a special use permit. Plaintiffs argue that the distinction is significant because the twenty-year special use permit contemplated in Alternative B in the DEIS states that "[t]his permit is a license for the use of federally owned land and does not guarantee permanent, possessory interest in real property . . . ." (AR–LD at 471.) Unlike the special use permit, the Long Draw Easement cannot be amended at the discretion of the Forest Service and has the effect of conveying an actual property interest in National Forest land to WSSC.

As set forth above, NEPA regulations require the agency to supplement an EIS only when the agency makes substantial changes in the proposed action *that are relevant to environmental concerns.* 40 C.F.R. § 1502.9(c)(1)(I). Here, the issuance of an easement changes the legal status of WSSC's authorization, but it does not change either the footprint of the reservoir upon the environment or the operations analyzed in the FEIS. The easement gives the Forest Service the right to impose conditions as with a special use permit. Subparagraph I.B. of the Easement provides: "The terms and conditions of this authorization shall be subject to revision in the years 2014, and 2034 to reflect

changing times and conditions as specified in subparagraph I.C." (AR–LD at 4899.) Subparagraph I.C. provides: "Upon revision in the years 2014 and 2034, this easement is subject to then-current laws, regulations, Federal and State land use plans and other management decisions of the authorized officer or his or her superior applicable to management of National Forest System lands to the same extent as if the easement had been terminated and a new easement issued except that the question of whether the occupancy is in the public interest and can be continued will be answered in the affirmative." *Id.* Moreover, the easement can be revoked by the Forest Service if WSSC fails to comply with the terms and conditions. *Id.* at 4901.

Finally, although the DEIS included a proposed special use permit, both the FEIS and the ROD considered the issuance of a land use authorization. Both the DEIS and the FEIS explained that two of the alternatives being considered were effectively perpetual grants, as is an easement. As the FEIS explained, "Alternatives A and B both establish a policy that has the effect of making the land use and its affects permanent by removing the opportunity for the public to change permit conditions, when that use has been shown to have avoidable adverse effects. This has the effect of converting the temporary land-use authorization into a perpetual grant or property right." (AR–LD at 3126.) The Forest Service's determination that a SEIS was not required to change the authorization to an easement is not arbitrary and capricious.

E. FOREST AND RANGELAND RENEWABLE RESOURCES PLANNING ACT

Plaintiffs allege the following claims: (1) a violation of FRRRPA in exempting certain facilities from substantive requirements of the Forest Plan; (2) a violation of FRRRPA in failing to ensure that authorization for use of National Forest System lands be consistent with the Forest Plan; and (3) a violation of FRRRPA in failing to allow public participation in amending the Forest Plan. The National Forest Management Act of 1976 (NFMA), which amended Section 6 of FRRRPA, requires the Secretary of Agriculture to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System ...." 16 U.S.C. § 1604(a). The Forest Service developed the Land and Resource Management Plan for the Arapaho and Roosevelt National Forest and Pawnee National Grassland ("Forest Plan") in 1984, with considerable public notice and involvement. (AR–G at 752.)

 The Forest Plan contains standards and guidelines to assist the Supervisor in managing the Forest's fishery resources. In particular, the Forest Plan's Direction required the Forest Supervisor to "[m]anage waters capable of supporting self-sustaining trout populations to provide for those populations," "[i]mprove fish habitats and manage wildlife habitats to maintain viable populations of native species," and "[m]aintain habitat for viable populations of all existing vertebrate wildlife species." (AR–G at 2446–47.) The Forest Plan's Direction also required that "[s]pecial use permits, easements, rights-of-way, and similar authorizations for use of [National Forest System] lands shall contain conditions and stipulations to maintain instream or bypass flows necessary to fulfill all National Forest uses and purposes." *Id.* at 2447. Plaintiffs argue that these requirements are non-discretionary and given these directives, the Forest Service's decision to grant the Long Draw Easement and exempt Long Draw from the Forest Plan requirements was arbitrary and capricious and unlawful. Plaintiffs further contend that the amendment to the

Forest Plan was a "significant change" requiring public involvement pursuant to NFMA.

Congress has authorized the Forest Service to amend forest plans "in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section." 16 U.S.C. § 1604(f)(4).[8] Under the regulations in effect at the time of the Forest Service's decision, the appropriate procedures for amending the plan turned on whether the amendment is significant or non-significant. When an amendment is non-significant, the agency need only provide "appropriate public notification and satisfactory completion of NEPA procedures" before adopting the amendment. *Sierra Club v. Cargill*, 11 F.3d 1545, 1547 (10th Cir.1993); 36 C.F.R. § 219.10(f). The Forest Service applied the procedures for a non-significant amendment when it amended the Forest Plan to allow Long Draw reservoir to be reauthorized without bypass flows. Both the DEIS and the FEIS informed the public that if an alternative were selected which did not impose bypass flows, the Forest Plan "direction to issue permits with bypass flows and to maintain habitat potential" would have to be amended. (AR–LD at 364, 3077–78.)

The regulations provide little guidance as to when a change is significant, directing only that the determination should be "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan." 36 C.F.R. § 219.10(f). However, as a general matter we review such an agency determination only as to whether it is arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).... Further, in this case the regulation expressly commends the determination of the significance of an amendment to the Forest Supervisor's judgment. 36 C.F.R. § 219.10(f).

*Cargill*, 11 F.3d at 1547.

Here, the Forest Service considered whether the proposed amendment would impact Forest Plan objectives and management prescriptions in determining that the proposed amendment was not significant. (*See* AR–G at 2301A.) The Forest Service reasoned that the amendment would have a relatively short time frame since the entire plan was due for revision within one or two years. *Id.* While Plaintiffs argue the amendment must be significant because of its impact on the 1.2 mile segment of La Poudre Pass Creek, the Forest Service observed that the amendment would impact a small area relative to the size of the overall planning area. The Forest Service also found that the change brought about the amendment would not affect any Forest Plan objectives or outputs nor affect management area prescriptions. *Id.* Moreover, the Forest Service has the authority to amend a Forest Plan to allow a project to go forward. *See Citizens' Committee To Save Our Canyons v. U.S. Forest Service*, 297 F.3d 1012 (10th Cir.2002). Applying the proper deferential standard, this Court cannot say that the Forest Service acted arbitrarily and capriciously in treating the proposed forest plan amendment as a non-significant change or in ultimately amending the plan to allow for implementation of Alternative B.

**F. WILD AND SCENIC RIVERS ACT**

■ Plaintiffs allege that the Defendants' decision to grant the Long Draw

8. The Government represents that at the time of the Forest' Service's decision in this case, the forest plant for the Arapaho and Roosevelt National Forests had already been amended nineteen times since its adoption in 1984.

Easement without terms and conditions requiring the maintenance of minimum by-pass flows to the La Poudre Pass Creek fails to protect and enhance the portion of the Cache la Poudre River designated as "wild" under the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. §§ 1271–1287. La Poudre Pass Creek is a tributary to this segment of the Cache la Poudre. "Wild" rivers are defined under the WSRA as "[t]hose rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent vestiges of primitive America." 16 U.S.C. § 1273(b)(1).

Each component of the national wild and scenic rivers system shall be administered in such manner as to protect and enhance *the values which caused it to be included in said system* without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values. In such administration primary emphasis shall be given to protecting its esthetic, scenic, historic, archaeologic, and scientific features. *Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area.*

16 U.S.C. § 1281(a)(emphasis added).

Plaintiffs contend that the absence of minimum bypass flows from Long Draw Reservoir to La Poudre Pass Creek negatively affects the scenic, scientific and recreational values for which the Cache la Poudre was designated as a wild and scenic river.

The FEIS concluded that adoption of either Alternative A or B would have no effect on the Wild and Scenic River values because the designation was based on the current streamflow and recreation use on the Cache la Poudre. (AR–LD at 3117.)

It is significant both as a matter of fact and as of law that the Cache la Poudre was designated a Wild and Scenic River although Long Draw Reservoir had been largely dewatering La Poudre Pass Creek during the winter for over sixty years. It is significant as a matter of fact because that flow regime created the conditions and values recognized as "outstandingly remarkable" by the designation of the Cache la Poudre. It is significant as a matter of law because when Congress designated the Cache la Poudre as a Wild and Scenic River it expressly protected existing water uses, including reservoir operations.

Inclusion of the designated portions of the Cache la Poudre River in the Wild and Scenic Rivers System under section 101 of this title shall not interfere with the exercise of existing decreed water rights to water which has heretofore been stored or diverted by means of the present capacity of storage, conveyance, or diversion structures that exist as of the date of enactment of this title, or operation and maintenance of such structures.

Pub.L. 99–590, § 102 (1986).

Accordingly, the Court finds that the Forest Service met its obligations pursuant to the Wild and Scenic Rivers Act.

### CONCLUSION

For the reasons stated herein, Plaintiffs' Second, Fifth, Ninth and Thirteenth Claims are DISMISSED for failure to exhaust administrative remedies; Plaintiff's Motion for Summary Judgment is GRANTED as to their First Claim for violation of FLPMA, and DENIED as to all other remaining claims for relief. THEREFORE, it is hereby

**ORDERED** that the decision of the Forest Service to issue the Long Draw Easement is **REVERSED**. This matter is

REMANDED to the agency for further consideration in accordance with its obligations under FLPMA.